Filed 4/7/15; pub. order 5/5/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DAVID DAVIS, | B256737 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC061441) |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donna Fields Goldstein, Judge.  Affirmed.

David Davis, in pro. per., for Plaintiff and Appellant.

Southern California Edison Company, Leon Bass, Jr., and Julia A. Mosel for Defendant and Respondent.

_____

## INTRODUCTION

This action arises from plaintiff David Davis's applications to Southern California Edison Company (SCE) to interconnect solar generating systems on property he owned to the SCE electricity distribution system (electricity grid) to generate electricity for use on those properties and to sell to SCE. Davis contends that SCE, in processing his applications, violated SCE's Tariff Rule 21 (Rule 21), Tariff Rule 16 (Rule 16), the California Renewable Energy Small Tariff (CREST) program, and the Net Energy Metering (NEM) program.[1]

SCE filed a demurrer on the ground that the California Public Utilities Commission (PUC) had exclusive jurisdiction to resolve the dispute and, therefore, the superior court lacked jurisdiction to hear Davis's claims. At issue on appeal is the potential conflict between Public Utilities Code section 1759,[2] which limits jurisdiction to review an order of the PUC to the Court of Appeal and the Supreme Court, and section 2106, which grants jurisdiction to the superior court to hear actions for damages against a public utility that violates California law. The trial court sustained SCE's demurrer without leave to amend, entered judgment against Davis, and dismissed the case without prejudice.[3]

---

[1]    All three tariffs have been published and approved by the California Public Utilities Commission and, therefore, have "the force . . . of a statute." (*Dyke Water Co. v. Public Utilities Com.* (1961) 56 Cal.2d 105, 123; accord, *Los Angeles Cellular Telephone Co. v. Superior Court* (1998) 65 Cal.App.4th 1013, 1018.)

[2]    All further statutory references are to the Public Utilities Code unless otherwise indicated.

[3]    We find that the court's dismissal without prejudice is an appealable order because the dismissal was by the court without any agreement by the parties as to future litigation or waiver of the statute of limitations. (See *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1106 [distinguishing judgments where the parties agree to toll the statute of limitations, holding, "[i]t is that assurance—the agreement keeping the dismissed count legally alive—that prevents the judgment disposing of the other causes of action from achieving

We conclude that the trial court correctly held that the PUC had exclusive jurisdiction over Davis's claims under our Supreme Court's holding in *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 917-918 (*Covalt*)[4] because adjudication of Davis's claims would "'hinder or frustrate the commission's declared supervisory and regulatory policies'" with respect to interconnection of solar generating facilities under Rule 21, Rule 16 and the CREST and NEM programs.

While Davis's remedies before the PUC may be more limited than those available in the trial court, to the extent Davis has viable damage claims following the PUC's adjudication of his administrative complaints currently pending before the PUC, those claims will only become ripe for filing in the trial court once the PUC reaches a final decision. (See *Schell v. Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039, 1047.)

We affirm.

---

finality"]; *Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 666 [dismissal of claims under California Environmental Quality Act (CEQA) appealable where non-CEQA claims were dismissed without prejudice absent any agreement of parties as to future litigation].) In this case, the trial court dismissed the case without any agreement by the parties as to future litigation or a waiver of the statute of limitations. While it appears the court envisioned a potential future lawsuit by Davis if he prevails before the PUC, this possibility does not render the judgment non-appealable.

[4] Later courts have referred to the decision in *San Diego Gas & Electric* as the "*Covalt*" case because Covalt was a real party in interest in the case. (See, e.g., *People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1145; *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 264 (*Hartwell*).)

3

**A.  *SCE's Tariffs Governing Solar Generating Facilities*[6]**

1.  *SCE's Tariff Rule 21*

All residential solar generating facilities seeking to interconnect to SCE's electricity grid must comply with Rule 21.[7]  Rule 21 governs all aspects of interconnection, including the interconnection application submission process, the process for reviewing interconnection applications, the assignment of a generator's position in the interconnection queue, the engineering review details, the cost responsibilities of the generators and SCE, and the design and operation requirements for the generating facility.  Rule 21 applies both to solar generators that intend to sell power

---

[5]     On review of a judgment of dismissal after sustaining of a demurrer, "[w]e assume the truth of all facts properly pled and the truth of facts that may be implied or inferred from these allegations."  (*White v. State of California* (2001) 88 Cal.App.4th 298, 304; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)  The facts in the factual background are therefore taken from Davis's verified complaint, as well as documents in the record on appeal.

[6]     """Tariffs" refer collectively to the sheets that a utility must file, maintain, and publish as directed by the [PUC], and that set forth the terms and conditions of the utility's services to its customers . . . .'  [Citations.]"  (*Clean Energy Fuels Corp. v. Public Utilities Com.* (2014) 227 Cal.App.4th 641, 644, fn. 1.)
       Tariffs and tariff rules are authorized pursuant to section 489, subdivision (a), which provides:  "The commission shall, by rule or order, require every public utility other than a common carrier to file with the commission within the time and in the form as the commission designates, and to print and keep open to public inspection, schedules showing all rates, tolls, rentals, charges, and classifications collected or enforced, or to be collected or enforced, together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service . . . ."

[7]     Rule 21 was amended effective September 20, 2012, at which time Davis's solar applications to SCE were pending.  We note any changes to relevant sections of Rule 21 below.  Also, where a section has been moved or renumbered, we will include the new section number in brackets.

to SCE under the CREST program and to solar generators that intend to use their generation to offset their own electricity usage under the NEM program.

Rule 21 provides deadlines for the interconnection approval process. A threshold determination must be made as to whether the project is eligible for the "fast track." Under section E.2.b.i, Rule 21 provides that "[n]on-Exporting and Net Energy Metered [NEM] Generating Facilities are eligible for Fast Track evaluation regardless of the Gross Nameplate Rating of the proposed Generating Facility." For an "Exporting Generating Facility," fast track is available under certain conditions set forth in section E.2.b.i. Section F.1.b provides for a "Fast Track Review" for projects "that do not require Detailed Study."

Rule 21 provides deadlines for (1) determination of whether an application is complete, (2) completion of an initial engineering review once the application is complete, and (3) completion of SCE's review of the application. We discuss these deadlines in more detail below.

Rule 21 provides in section K.1 for resolution of disputes: "In addition to the informal procedures for timeline-related disputes set out in Section F.1.d, the following procedures will apply for disputes arising from this Rule: [¶] . . . [¶] The Commission shall have initial jurisdiction to interpret, add, delete or modify any provision of this Rule or of any agreements entered into between Distribution Provider and Applicant or Producer to implement this tariff . . . and to resolve disputes regarding Distribution Provider's [SCE's] performance of its obligations under Commission-jurisdictional tariffs, the applicable agreements, and requirements related to the interconnection of Applicant's or Producer's Generating Facility or Interconnection Facilities pursuant to this Rule." Section K.2.c provides procedures for parties to resolve disputes, including through mediation, and further, "[a]t any time, either Party may file a formal complaint before the Commission. . . ."

### 2. *The CREST Solar Generation Program*

Section 399.20, subdivision (a), declares the "intent of the Legislature to encourage electrical generation from eligible renewable energy resources." SCE filed the CREST program with the PUC pursuant to subdivision (c), which requires utilities, including SCE, to file with the PUC a standard tariff providing for the purchase of renewable energy from electric generating facilities. The PUC has approved the CREST program.

To be eligible for CREST, an SCE customer must own and operate an eligible solar generating facility that "[h]as an effective capacity of not more than 1.5 MW [megawatts] and is located on the premises owned or under the control of the customer." Under section 399.20, subdivision (f), SCE was required to make CREST available to solar generating facilities "on a first-come-first-served basis," assigning each generating facility a queue position based on the date it entered into a power purchase agreement with SCE. SCE was required to keep CREST open for eligible generators until SCE met its proportionate share of a statewide cap of 750 megawatts. Effective July 24, 2013, SCE met its obligation to purchase the required amount of eligible generation under CREST, and the CREST program closed to new customers.

### 3. *The NEM Solar Generation Program*

SCE established the NEM program pursuant to section 2827. NEM allows eligible customers who install renewable generation at their homes or businesses to offset their consumption of electricity by the amount of electricity they generate. (§ 2827, subd. (b)(6).) Section 2827 also provides for "'[n]et surplus electricity compensation'" to a customer where the customer produces more power than it consumes over the course of a year. (*Id*., subd. (b)(9).) Rule 21 provides for expedited procedures for NEM generators seeking to interconnect to SCE's electricity grid.

6

4. *California Solar Initiative Program (CSI)*

The PUC oversees the CSI program, which provides cash incentives to utility customers who install solar generating systems for their homes and other properties. In order to be eligible for CSI incentives, the solar generating system needs to be "sized" so that the electricity generated by the system offsets part or all of the customer's electrical needs.

## B. *Davis's Applications To Interconnect His Solar Generating Systems*

Davis alleges he is a residential customer of SCE. SCE is a public utility subject to regulation by the PUC (Cal. Const., art. XII, § 1; § 201 et seq.). In 2012 Davis proposed to install solar generating systems on residential properties he owned in San Bernardino County. Davis submitted 20 applications, including for rental properties at 65911 29 Palms Highway (8 units), 60215 and 60219 Alta Loma (4 units), 6804 Park Boulevard (5 units), 6807 Park Boulevard, and 6815 Park Boulevard. Davis also proposed to increase the size of the solar generator at his home in Joshua Tree from 6 to 18 kilowatts (kW).

Davis planned to interconnect the solar systems on his properties with SCE's electricity grid and to sell his surplus electricity to SCE in accordance with "any of the several tariffs" available for the sale of excess electricity. As we discuss below, Davis initially submitted his applications under the CREST tariff program. When those applications were not approved, he submitted similar applications under the NEM program.

## C. *Davis's Complaint for Damages*

Davis filed this action on November 20, 2013. All of the causes of action arise out of Davis's attempt to interconnect solar generating systems on his properties to the SCE electricity grid. In his complaint, Davis alleges that SCE breached its duties owed to him pursuant to Rule 21, Rule 16, and CREST. Davis contends the court has jurisdiction to enforce these orders pursuant to section 2106, which provides that a public utility is liable

7

for damages resulting from its unlawful acts or omissions under state law and that a person may bring "[a]n action to recover for such loss, damage, or injury . . . in any court of competent jurisdiction . . . ."

### 1. *First Cause of Action for Deceit Relating to NEM Program*

The complaint's first cause of action alleges deceit in violation of Civil Code section 1710.2. Davis alleges that on April 20, 2012 the NEM Manager of SCE, Melissa Patrick, represented to him that "SCE has a procedure for reviewing all NEM residential applications for appropriate sizing," but this statement was not true. Davis alleges he relied on this representation by building solar generators that "can not be used."

As we discuss below, while this allegation is phrased as "deceit," it tracks the allegations in the second complaint he filed with the PUC in November 2013 in which he alleges that some of his solar projects were not approved because they were too large and, as to others, he was required to reduce the size to obtain CSI incentive funding. Davis alleges he was damaged by the loss of use of some solar generators and the delay in approval of other generators.

### 2. *Second Through Fourth Causes of Action Alleging Violation of NEM Program Deadlines*

Davis's second through fourth causes of action allege SCE's failure to comply with Rule 21's deadlines for processing NEM applications. Davis alleges that by the time his solar applications were approved, the solar systems had been in place and ready to turn on for over a year. He also alleges that at the time of filing the complaint, some of his solar applications had not been approved.

#### a. Davis's NEM Applications

Davis initially applied to connect his solar generating systems under the CREST program, which we discuss below with respect to the sixth through eighth causes of action. When those applications were not approved, Davis proceeded to apply for

8

approval under the NEM program. From April 4, 2012 to September 25, 2012 Davis submitted 20 applications to install solar systems for his home and rental properties under the NEM program. Davis submitted two sets of applications. One group of applications proposed to install for each house or unit 30 solar panels and one 5 kW inverter. The 5 kW units were proposed for the following properties: 6804 Park Boulevard (five units), 6807 Park Boulevard, 6815 Park Boulevard, and 60215 and 60219 Alta Loma (four units).

Davis also submitted applications for 10 kW projects for the eight rental units at his 65911 29 Palms Highway property. These projects included two 5 kW inverters and associated solar panels. Davis also proposed to increase the size of the solar generator on his home from 6 kW to 18 kW.

Between July 18, 2012 and October 12, 2012, SCE approved and interconnected all the proposed 5 kW systems. Davis alleges that "SCE expeditiously interconnected each project within 30 days (usually much less) of me sending the Job Card."[8]

On September 5 and 6, 2012 SCE granted Davis permission to operate 10 kW systems for units 5 and 6 at the 29 Palms property. After receiving approval for units 5 and 6, Davis built 10 kW systems for units 3 and 4, and SCE staff told Davis the applications for the two new systems "were fine." Based upon SCE's approval for units 5 and 6 and the representation that the applications for units 3 and 4 "were fine," Davis built the remaining 10 kW systems for units 1, 2, 7, and 8 starting on October 15, 2012.

While the applications for the 10 kW systems were pending, Davis filed two formal complaints with the PUC against SCE regarding SCE's interpretation of the NEM tariff, which we discuss in more detail below. Davis alleges that in September 2012, when the PUC ordered SCE to answer Davis's first complaint, "SCE stopped processing my NEM applications in the expeditious way that they had been previously [doing]." In

---

[8] The "Job Card" refers to the "Building and Safety Final Electrical Inspection Job Card" issued by the local building and safety department, which is the final document the applicant submits on a NEM application before the application is deemed complete.

November 2012 and January 2013 SCE retroactively deemed some applications incomplete that it had previously deemed complete.

Davis also alleges that when he submitted a corrected application for the solar system for his home in November 2012, he did not receive a response from SCE as to whether his corrected application was complete for 56 business days, until February 25, 2013. Davis alleges that this violated SCE's obligation under Rule 21 to inform an applicant whether its application is complete within 20 working days.

b. Davis's Allegations of Non-compliance with Deadlines

The second cause of action alleges that SCE failed to comply with the requirement in Rule 21, section C.1.b.(1) [E.5.a] that SCE review interconnection applications for completeness and provide notice to the applicant within 10 working days of receipt whether the application is complete. Davis alleges that SCE failed to inform him when his applications were complete, only letting him know when they were incomplete. Later, SCE retroactively deemed many of his applications for solar generation to be incomplete.

The third cause of action alleges that SCE failed to comply with the requirement that it complete the initial engineering review of each application within 20 business days from when the application is deemed complete, as required by Rule 21, section C.1.c [F.2.a].[9] Davis alleges that because SCE did not complete engineering studies of his solar generating systems, he built them without knowing what upgrades would be necessary to interconnect to the SCE electricity grid, delaying his operation of those units.

The fourth cause of action alleges that SCE failed to comply with the 30-day deadline to complete the processing of NEM interconnection applications, as required by Rule 21, section C.2.d [D.13.b], or notify Davis "'of the reason for the inability to

---

[9]     Effective September 20, 2012, this time frame was reduced to 15 business days.

10

process the Interconnection Request and the expected completion date.'" Section D.13.b provides that qualifying generating facilities under the NEM program "shall *normally* be processed not later than thirty (30) Business Days following Distribution Provider's receipt" of various documents, including "evidence of Applicant's final electric inspection clearance from the Governmental Authority having jurisdiction over the Generating Facility." (Italics added.) This section provides many exceptions to the 30-day deadline and provides that certain applicants "are advised to submit their Interconnection Request at least six (6) months in advance of their planned Commercial Operation Date."

Davis alleges that SCE delayed approval of some of his solar system applications and, because it did not inform him of the delay, Davis proceeded to build the units. Davis alleges that he was harmed by having to pay for electricity used prior to being allowed to turn on the solar systems.

### 3. *Fifth and Ninth Causes of Action for Overcharges on NEM Upgrades*

The fifth cause of action alleges that SCE failed to pay for distribution upgrades for NEM interconnections, as required by Rule 21, Table C.2 [E.4.f]. According to Davis, Rule 21 requires that SCE pay for "distribution" upgrades and the applicant pay for "interconnection" upgrades for NEM interconnections. The property at 65911 29 Palms Highway had eight units each with an electric meter. SCE upgraded the "distribution" conductor for the building and billed Davis $4,071.25 for the upgrade, even though the upgrade was SCE's responsibility under Rule 21 as a "distribution" upgrade.

According to Davis, SCE later acknowledged that it had an obligation to perform a portion of the distribution system upgrades. On July 30, 2013 SCE performed distribution upgrades at its own expense, including "replacement of the distribution conductor from the transformer to the point of coupling where it connects to each of the four distribution conductors each of which serves the two customer meters of each duplex." However, the SCE engineer in charge of the project upgraded a distribution

11

conductor to size 1/0 although he knew that a size 4/0 was required to operate the solar generating systems on the property. Davis alleges that SCE then improperly billed Davis for removing the 1/0 conductor and installing the necessary 4/0 conductor.

The ninth cause of action, similar to the fifth cause of action, alleges that SCE inconsistently applied the definitions of "Interconnection Facility" and "Distribution Service," in violation of Rule 21, section H and the Public Utilities Code.

4. *Sixth Cause of Action for Overbilling on CREST Applications*

In January 2012 Davis submitted to SCE 12 interconnection applications pursuant to Rule 21 seeking to interconnect solar generating systems at his home and rental units to SCE's electricity grid. The applications proposed to sell the excess electricity to SCE and made clear that they were not submitted under the NEM program. However, Davis's applications stated he was interested in more than one possible tariff under which to sell excess power. SCE deemed Davis's applications incomplete because they failed to specify a single tariff. In response, Davis selected the CREST program. Davis alleges that SCE did not take action on his 12 CREST applications from January to June 2012.

Davis alleges in the sixth cause of action that SCE charged him excessive fees for approval of his solar generating systems under the CREST program. Specifically Davis alleges that SCE should have reduced the fees for his "atypical" application. Under Rule 21, section C.1.b(5) [E.3.a(iv)], an "applicant may propose and SCE may agree to reduced costs for reviewing atypical applications, such as Applications submitted for multiple generators, multiple sites and otherwise as conditions warrant." SCE acknowledged to Davis in writing that his applications were "atypical" because they were for smaller 18 kW residential applications as compared to "typical" non-NEM applications for large or industrial projects ranging from 250 to 3000 kWs. However, SCE denied Davis's request to reduce the costs SCE charged him for his applications.

Davis also alleges that SCE overcharged him by requiring that one study be prepared for each solar generating system instead of performing one study for each of his multi-unit properties. Davis alleges that at each property, every unit had an individual

customer electric meter, but each property was served by a "single distribution conductor and a single SCE transformer," so the studies would be identical for each solar generating system on the property. SCE rejected Davis's proposals and assessed fees of $61,400 per electric meter for a total of $491,200 for the eight units at 65911 29 Palms Highway and $245,600 for the four units on Alta Loma.

5. *Seventh and Eighth Causes of Action for Unlawful Approval of Coronus Energy Corporation's CREST Application*

Davis alleges that SCE offered preferential treatment to a commercial solar power generator, Coronus Energy Corporation (Coronus), which resulted in SCE's denial of Davis's CREST applications.[10]

a. *Coronus's Applications*

At the same time Davis's CREST applications were pending, SCE was negotiating with Coronus on its applications for commercial solar farms. The farms were "just a few hundred yards away from each of [Davis's] premises," and were served by the same portion of SCE's electricity grid as the Davis properties. Coronus's interest in interconnection for its solar farm project was predicated on entering into a CREST agreement with SCE. Coronus's corporate filing with the Securities and Exchange Commission made clear that Coronus only intended to operate the projects if it could do so under CREST.

As of 2012, the CREST program was nearing its end because it was close to being oversubscribed. SCE continued to process Coronus's applications to interconnect its solar projects to the electricity grid until the transmission and distribution lines became

---

[10]     Davis also alleges as part of his sixth cause of action that SCE charged Coronus lower fees for its application. Specifically, according to Davis, SCE charged Coronus only $11,400 for the studies necessary to approve interconnection of a 1500 kW generator to the electricity grid. By contrast, SCE charged Davis $61,400 for studies on a single 18 kW solar generator.

13

oversubscribed. Effective July 24, 2013, SCE met its obligation to purchase the required amount of eligible generation under CREST and the CREST program closed to new customers.

Davis contends that SCE, by processing Coronus's applications and placing Coronus in the "queue" for approval ahead of Davis, prevented Davis from having his applications approved prior to the closing of the CREST program. According to Davis, "[b]oth the costs of interconnection, and the availability of CREST are limited by 'queue' systems where each entry into the 'queue' makes subsequent entry by others either more expensive, more difficult, or impossible."

At the heart of Davis's claims is the allegation that Coronus was not eligible for the CREST program because of the size of its projects. Under section 399.20 and the CREST program, only generating facilities under 1.5 megawatts can participate in the program. Davis alleges that Coronus's projects were larger than 1.5 megawatts, including one that was 7.5 megawatts and two that were 4.5 megawatts. Davis alleges that SCE was able to circumvent the 1.5 megawatt restriction by using a procedure called "daisy chaining." According to Davis, "'[d]aisy chaining' is splitting one large project into several smaller ones for the purpose of evading maximum size limitations."

Davis alleges that on May 24, 2012 in Decision 12-05-035, the PUC specifically prohibited "daisy-chaining" to evade project size limitations. This decision is attached as exhibit 4 to SCE's request for judicial notice.[11] The PUC finds in this decision, with

---

[11] On September 11, 2014 SCE filed a request for judicial notice of 19 documents. First, "SCE requests that the Court take judicial notice of six documents that were not previously presented to the Trial Court," which are attached as exhibits one through six. We grant the request as to exhibits one through three, which are documents filed in Davis's PUC proceeding, including a "Scoping Memo and Ruling" regarding how the PUC proceeding would proceed (Exhibit 1), the Second Amended Complaint dated June 19, 2014 filed with the PUC (Exhibit 2), and a transcript of an evidentiary hearing before Administrative Law Judge Jeanne McKinney on August 18, 2014 (Exhibit 3). We also grant SCE's request for judicial notice of Exhibits 4 and 5, which are PUC decisions relating to other projects, which address the "daisy-chaining" procedure. However, we

14

respect to a different solar program: "[w]e agree . . . that additional measures must be taken to prevent daisy-chaining and agree with the concerns raised regarding daisy-chaining to evade the project size restrictions."

On August 30, 2012 SCE entered into CREST agreements with Coronus, even though the PUC had two months earlier prohibited "daisy chaining." Davis alleges that once SCE agreed that his interconnection applications were eligible for CREST, Coronus "had used up all of the available capacity on the distribution and transmission lines in our area and interconnection would have entailed years of delay and prohibitive cost."

Davis also alleges that SCE violated its Rule 16 on "Service Extensions" by approving the Coronus application because the tariff provides that no more than one service may be supplied to "a single enterprise on a single premise." By contrast, SCE rejected one of Davis's CREST applications on the basis that Rule 16 prohibited more than one service to a single premise.

---

deny SCE's request for judicial notice of Exhibit 6, a PUC decision regarding SCE's Tariff Rule 22 for lack of relevance.

We take judicial notice of exhibits one through five as administrative records of the PUC. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); *Hartwell*, *supra*, 27 Cal.4th at p. 286, fn. 4 [taking judicial notice of PUC orders issued after filing of the Court of Appeal opinion]; *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 375, fn. 4. [court may take judicial notice of administrative agency records]; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1220, fn. 38 ["briefs filed . . . in rulemaking proceedings before the PUC" judicially noticed under Evid. Code, §§ 452, subd. (c), 459].) We take judicial notice of the documents for the purpose of determining the procedural posture of this case before the PUC, but """"we do not take judicial notice of the truth of all matters stated therein."""" (*People v. Castillo* (2010) 49 Cal.4th 145, 157.)

The request for judicial notice also asks that this court take judicial notice of 13 documents that were before the trial court and are included in the Joint Appendix. This request is denied as unnecessary because the documents were part of the record before the trial court and are included in the record on appeal. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 87, fn. 5)

15

b. *Allegations Relating to Approval of the Coronus Applications*

The seventh cause of action alleges that SCE breached its duty to apply its tariffs, including Rule 21, uniformly to all customers, specifically alleging preferential treatment for Coronus.

The eighth cause of action alleges SCE unlawfully allowed Coronus to "daisy chain" its projects and thereby occupy space in both the CREST queue and the interconnection queue for projects larger than 1.5 megawatts.  Davis alleges that SCE's approval of Coronus's application violated section 399.20, the CREST tariff, Rule 16, and the PUC's decision on daisy-chaining (No. 12-05-035).

**D.  *SCE's Demurrer and the Trial Court's Ruling***

On January 17, 2014 SCE demurred to all nine causes of action on the grounds that: (1) the superior court lacked subject matter jurisdiction to hear the action because Rule 21, section K.1. grants "initial jurisdiction" to the PUC "to interpret, add, delete or modify any provision of this Rule or any agreement entered into between Distribution Provider and Applicant or Producer to implement this tariff . . .and to resolve disputes regarding Distribution Provider's performance of its obligations under Commission-jurisdictional tariffs, the applicable agreements, and requirements related to the interconnection of Applicant's or Producer's Generating Facility or Interconnection Facilities pursuant to this Rule"; (2) the complaint is barred under section 1759; (3) the complaint is barred because Davis failed to exhaust mandatory dispute resolution procedures in Rule 21, section K; and (4) at a minimum, the action should be stayed and the claims referred to the PUC under the primary jurisdiction doctrine.

On March 28, 2014 the trial court sustained SCE's demurrer without leave to amend, holding that it was without jurisdiction to hear Davis's claims.  The trial court found that "[e]ach of [Davis's] claims arises from a dispute regarding [his] request to interconnect his power system to [SCE's] power grid."  Further, the court held that Rule 21 provided a dispute resolution process that, in section K.1., provides "that the Commission has initial jurisdiction to resolve disputes regarding the distribution

16

provider's performance of its obligations under Commission-jurisdictional tariffs." The court also held that "[t]he [PUC] has exclusive jurisdiction over the regulation and control of utilities, and once it has assumed jurisdiction, it cannot be hampered, interfered with, or second-guessed by a concurrent superior court action addressing the same issue." Finally, the court found that the "action would interfere with [the PUC's] initial jurisdiction to resolve the dispute." On these bases, the court sustained SCE's demurrer. The court also found that "[i]t is not reasonabl[y] possible for [Davis] to correct the defect that the Court lacks jurisdiction to hear his claims by amendment," and denied leave to amend.

The trial court entered a judgment of dismissal without prejudice on June 10, 2014.

### E. *Davis's Complaints Filed with the PUC*

Before filing this action, Davis filed two formal complaints with the PUC relating to his attempts to interconnect his solar generating systems to SCE's electricity grid. The first complaint was filed on August 23, 2012. In the complaint, Davis alleges that SCE violated section 2827, subdivision (c)(1), "by wrongly refusing to make the [NEM] tariff available for the purpose of interconnecting enough solar generating capacity to meet the electrical requirements of an electric vehicle charging station at [Davis's] residence, and . . . at any of [his] other properties . . . ."

Davis filed his second complaint with the PUC in November 2013. The second complaint alleges that SCE refused to approve some of his applications for solar generating systems at his 20 properties under the NEM program and required that Davis reduce the size of the systems to obtain CSI incentive funds. At some point the two complaints were consolidated into one proceeding.

On May 28, 2014 PUC Commissioner Michael Peevey and Administrative Law Judge Jeanne McKinney issued a "Scoping Memo and Ruling" (scoping memo) that sets forth the scope of the consolidated proceedings on the first two complaints. The scoping memo describes Davis's complaints as alleging that SCE "has violated [section] 2827[,

17

subdivision] (c)(1) by refusing to allow some of Davis's projects to interconnect under SCE's NEM tariff and by refusing to pay CSI incentives for some of the projects. SCE asserts that the projects are sized too large to qualify for the programs." (Fn. omitted.)

The scoping memo calls for evidentiary hearings on the factual issues raised and briefing on the legal issues. The scoping memo sets forth four issues for legal briefing, including a number of technical issues relating to the NEM program. For example, one legal issue is described as the question: "Can the annual estimated generation for purposes of NEM generating facility size requirements be calculated using the manufacturer's inverter efficiency rate for situations involving high panel to inverter ratios?" One of the three issues listed as requiring an evidentiary hearing is the following: "If Davis installs solar panels at properties he rents to tenants, resulting in electricity used not by Davis but by his tenants, does the installation still 'offset customer's own electrical requirements' such that the project can qualify for NEM under [section] 2827[, subdivision] (b)(4)?"

In its scoping memo, the PUC set a schedule for the proceeding, including legal briefing, testimony and issuance of a decision on the first two complaints by November 22, 2014, as well as the beginning of Phase 2 relating to the claims alleged in this action.

In June 2014, following the trial court's ruling sustaining SCE's demurrer, Davis filed a second amended complaint in the consolidated PUC proceeding, which alleges each of the claims set forth in his superior court complaint. The second amended complaint provides: "Other than minor formatting changes, Part Two is identical to the complaint dismissed by the superior court."

Judge McKinney held an evidentiary hearing on Davis's consolidated proceeding on August 18, 2014. At the hearing SCE sought a stay of the "Part 2 claims," referring to the claims that are at issue in this appeal. According to the record, Judge McKinney discussed this request with the parties and stated: "While we were off the record we determined that it makes sense to essentially hold the Part 2 claims until we get the

18

results of Mr. Davis's appeal."  Accordingly, the pending PUC proceeding has been stayed until resolution of this appeal.

## DISCUSSION

### A. *Standard of Review*

"In determining whether plaintiffs properly stated a claim for relief, our standard of review is clear:  '"We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]  We also consider matters which may be judicially noticed." [Citation.]  Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]  And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]"[12]  (*Zelig v. County of Los Angeles*, *supra*, 27 Cal.4th at p. 1126; accord, *Guerrero v. Pacific Gas & Electric Co.* (2014) 230 Cal.App.4th 567, 571 ["the judgment here must be affirmed unless plaintiffs can show that the complaint falls outside the scope of the PUC's jurisdiction or that the litigation will not interfere with the PUC's exercise of its authority"].)  "A demurrer is proper in cases in which the plaintiff is not able to state a cause of action which is within the subject matter jurisdiction of the court." (*Schell v. Southern Cal. Edison Co.*, *supra*, 204 Cal.App.3d at p. 1047.)

---

[12]     Davis does not seek leave to amend.  We find the trial court properly denied leave to amend because Davis presented no facts to suggest he could amend his complaint to avoid exclusive jurisdiction in the PUC.

**B.** *The PUC Has Exclusive Jurisdiction Over Regulation and Control of Public Utilities*

"'The commission [PUC] is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1-6.) The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures.'" (*Covalt*, *supra*, 13 Cal.4th at pp. 914-915; accord, *Hartwell*, *supra*, 27 Cal.4th at p. 264.)

Further, under the Public Utilities Act, the PUC has "broad authority to 'supervise and regulate every public utility in the State' (§ 701) and grants the commission numerous specific powers for the purpose. . . . [T]he Legislature further authorized the commission to '*do all things*, whether specifically designated in [the Public Utilities Act] *or in addition thereto*, which are necessary and convenient' in the exercise of its jurisdiction over public utilities. [Citation]." (*Covalt*, *supra*, 13 Cal.4th at p. 915.)

Among these powers, the PUC has the power to issue equitable relief, including injunctive relief and reparations to ratepayers, as well as to assess fines and penalties. (§§ 734, 2107; *Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 299.) However, as SCE acknowledges, the PUC's authority to order reparations to aggrieved ratepayers is limited to reparations for rates that are "unreasonable, excessive, or discriminatory" (§ 734) ; the PUC does not have authority to award other damages. (Cal. Const., art. XII, § 4; *Wise*, *supra*, at p. 299.)

As part of its grant of broad power to the PUC, "the Legislature has chosen to limit the jurisdiction of judicial review of the PUC's decisions." (*Hartwell*, *supra*, 27 Cal.4th at p. 265.) Specifically, section 1759, subdivision (a), provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

20

We next turn to the limits on judicial review of utility actions.

1. *The courts have applied the Covalt test to determine whether the PUC has exclusive jurisdiction over damage actions against public utilities.*

The courts have attempted to reconcile the limits on judicial review in section 1759 with the grant of jurisdiction to the superior court under section 2106. Section 2106 provides: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person."

Our Supreme Court first considered how to reconcile these two sections in the leading decisions of *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 (*Waters*) and *Covalt*, *supra*, 13 Cal.4th at pp. 917-918. As the court held in *Covalt*, citing to *Waters*, "[a]ddressing the question of statutory construction, this court declared the primacy of section 1759 and the correspondingly limited role of section 2106. The court held that 'in order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as *limited* to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies.' [Citation.]" (*Covalt*, *supra*, at pp. 917-918, quoting *Waters*, *supra*, at p. 4.)

The court in *Covalt* held further, "'[t]he PUC has exclusive jurisdiction over the regulation and control of utilities, and once it has assumed jurisdiction, it cannot be *hampered*, interfered with, or *second-guessed* by a concurrent superior court action addressing the same issue.' [Citation.]" (*Covalt*, *supra*, 13 Cal.4th at p. 918, fn. 20.) Moreover, "[u]nder the *Waters* rule, accordingly, an action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of

21

damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Id.* at p. 918, fn. omitted.)

Under this theory, the court in *Waters* found that an action for damages resulting from telephone service interruptions caused by the utility's negligence was barred by section 1759 because the plaintiff sought damages in excess of the utility's tariff. The court held that allowing the suit to proceed would thwart the PUC's "general policy" of limiting liability of telephone utilities for ordinary negligence. (*Waters*, *supra*, 12 Cal.3d at pp. 10-11.)

In *Covalt*, the court held that section 1759 barred a superior court action for damages allegedly caused by electric and magnetic fields from power lines operated by a public utility. In reaching this holding, the court established a three part test: (1) whether the PUC had the authority to adopt a regulatory policy; (2) whether the PUC had exercised that authority; and (3) whether the superior court action would hinder or interfere with the PUC's exercise of its regulatory authority. (*Covalt*, *supra*, 13 Cal.4th at pp. 923, 926, 935; accord, *Hartwell*, *supra*, 27 Cal.4th at p. 266; *Anchor Lighting v. Southern California Edison Co*. (2006) 142 Cal.App.4th 541, 549.)

Applying this test, the court in *Covalt* found that the PUC possessed the authority to regulate matters relating to electromagnetic fields around power lines; the PUC had exercised its authority to adopt policies reflecting its finding that it lacked sufficient information to decide whether the fields were dangerous; and a civil action would interfere with and hinder the ongoing regulatory efforts of the PUC. (*Covalt*, *supra*, 13 Cal.4th at p. 935.)

In *Hartwell*, our Supreme Court applied *Covalt*'s three-part test in finding that some of the plaintiffs' claims were barred under section 1759 in a civil action alleging that water utilities had provided them unsafe drinking water. (*Hartwell*, *supra*, 27 Cal.4th at pp. 275-278.) Specifically, the court found that the challenge to the adequacy

22

of the drinking water standards was barred because it would interfere with a "'broad and continuing supervisory or regulatory program' of the [PUC] . . . ." (*Id*. at pp. 275, 276.)[13] However, the court held that the plaintiffs could proceed on a theory that the drinking water failed to meet the federal and state drinking water standards because the claims would not interfere with the PUC's regulatory policy that water utilities comply with the standards. (*Ibid*.)

Other courts since *Covalt* have found civil actions barred under section 1759 where the action would interfere with the PUC's authority or policies. (See e.g., *Guerrero v. Pacific Gas & Electric Co.*, *supra*, 230 Cal.App.4th at pp. 576-577 [§ 1759 barred civil suit following pipeline explosion alleging utility misappropriated $100 million in ratepayer money that should have been spent on pipeline safety because lawsuit would interfere with PUC's ongoing administrative proceedings following the explosion]; *Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 242-243 [lawsuit alleging excessive tree trimming by utility around power lines above minimum standards set by PUC found within exclusive jurisdiction of PUC]; *Anchor Lighting v. Southern California Edison Co.*, *supra*, 142 Cal.App.4th at pp. 549-550 [§ 1759 barred civil suit by commercial business against SCE for refusal to provide it 10 percent discount provided to other commercial customers]; *Schell v. Southern Cal. Edison Co.*, *supra*, 204 Cal.App.3d at pp. 1042-1043, 1045-1046 [§ 1759 barred suit against utility by owner of recreational vehicle park alleging discrimination by utility for charging him commercial electricity rate where determination of appropriate rate was properly in exclusive purview of PUC].)

This district in *Anchor Lighting* addressed issues similar to those raised in this case. The court found that Anchor's lawsuit would interfere with the PUC's ratemaking function because determination of whether Anchor was entitled to the 10 percent discount

---

[13]    As to the preempted claims against the utilities, the court affirmed the Court of Appeal's holding that the trial court erred in staying the proceedings instead of ruling on the preemption issue. (*Hartwell*, *supra*, 27 Cal.4th at pp. 264, 282-283.)

would require an analysis of whether Anchor's peak energy demand would qualify it as a "small commercial customer" under SCE's tariff. (*Anchor Lighting v. Southern California Edison Co.*, *supra*, 142 Cal.App.4th at pp. 545, 550 & fn. 3.)

Similarly, in *Schell*, our colleagues in the Fourth District found that the PUC had exclusive jurisdiction over a lawsuit raising the question of whether a recreational vehicle park should be charged electricity rates applicable to mobile home parks or other domestic or commercial rates pursuant to an SCE tariff. (*Schell v. Southern Cal. Edison Co.*, *supra*, 204 Cal.App.3d at p. 1046.) The court found that this determination "is clearly within the exclusive purview of the PUC as part of its continuing jurisdiction over rate making and rate regulation . . . ." (*Ibid*.) The court in *Schell* noted, as here, that the issues raised in the plaintiff's case were pending in three separate cases before the PUC. (*Ibid*.)

Moreover, the court addressed the ability of the plaintiff to recover on his discrimination claims: "His counts relating to damages, injunctive, and other relief for Cal. Ed.'s alleged discrimination against him . . . will not be ripe until the PUC and the Supreme Court have made a final determination as to whether or not the DMS-II schedule [for mobile home parks] applies to him. Thus, none of the causes of action in plaintiff's amended complaint are properly before the court at this time." (*Schell v. Southern Cal. Edison Co.*, *supra*, 204 Cal.App.3d at p. 1047.)[14]

By contrast, in cases where the courts have found that the PUC does not have exclusive jurisdiction, the lawsuits have typically not required interpretation of PUC-approved rules. (See, e.g., *People ex rel. Orloff v. Pacific Bell*, *supra*, 31 Cal.4th at p. 1145 [court had jurisdiction over false advertising claims brought by district attorneys where suit would not undermine PUC policy or interfere with its regulatory authority]; *Mata v. Pacific Gas & Electric Co.* (2014) 224 Cal.App.4th 309, 320 [lawsuit by heirs of decedent who was electrocuted by a power line while trimming a tree not barred, finding

---

[14] The decision in *Schell* was cited approvingly by our Supreme Court in *Covalt*. (*Covalt*, *supra*, 13 Cal.4th at pp. 921-923.)

that damage action "complements and reinforces" utility rule requiring utility to exercise reasonable care in trimming trees to ensure that its power lines are safe];[15] *Cundiff v. GTE California Inc*. (2002) 101 Cal.App.4th 1395, 1411 [damage action against utility for deceptive billing disclosure practices not barred by § 1759]; *Wise v. Pacific Gas & Electric Co.*, *supra*, 77 Cal.App.4th at p. 295 [finding no exclusive jurisdiction over unfair competition and fraud claims alleging utility failed to replace old valves after charging ratepayers for the cost of its replacement program because lawsuit would not interfere or otherwise impede any PUC regulatory policy]; *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1246 [allowing civil suit against two cellular telephone service companies under Cartwright Act for price fixing, finding that suit would not "'hinder or frustrate'" the PUC's supervisory or regulatory powers].)

This district in *Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123 recently considered the impact of section 1759 on a lawsuit concerning stray voltage from SCE's electricity grid. In *Wilson*, the court held that the PUC did not have exclusive jurisdiction over the plaintiff's damage action for harm caused by stray voltage from the SCE electricity grid, holding: "In light of the absence of any indication that the PUC has investigated or regulated the issue of stray voltage, and without any evidence that stray voltage cannot be mitigated without violating the PUC's regulation requiring grounding, we cannot say that Wilson's lawsuit would interfere with or hinder any supervisory or regulatory policy of the PUC." (*Id.* at p. 151.)

---

[15]    Both *Mata* and *Sarale* involved actions against utilities for their tree trimming practices. The First District in *Mata* distinguished the Third District ruling in *Sarale* on the basis that *Mata* involved whether the utility company used reasonable care in keeping its power lines safe above the minimum mandated by the PUC; *Sarale* involved a claim by landowners that the utility company trimmed the trees beyond what was mandated by the PUC rule. (See *Mata v. Pacific Gas & Electric Co.*, *supra*, 224 Cal.App.4th at pp. 319-320; *Sarale v. Pacific Gas & Electric Co.*, *supra*, 189 Cal.App.4th at p. 242.) The court in *Mata* noted that "recognition of the landowners' claims [in *Sarale*] would have effectively countermanded the authorization that the PUC granted the utility to make that determination and to extend clearance beyond the minimum when necessary to ensure service reliability or public safety." (*Mata*, *supra*, at p. 319.)

Davis relies heavily on *Vila v. Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469 and *Cundiff v. GTE California Inc.*, *supra*, 101 Cal.App.4th 1395 to support his position that section 2106 authorizes "[t]he 'full power of the courts to pass judgment on what utilities do.'" Both cases are distinguishable.

In *Vila*, a customer sued a water company for its failure to provide water service, causing the building to be vacant. Significantly, the court found that the utility had "an unambiguous provision in its own rules" that required the provision of water and that the suit would therefore be "in aid and not in derogation of the jurisdiction of the commission." (*Vila v. Tahoe Southside Water Utility*, *supra*, 233 Cal.App.2d at p. 479.) Further, the court held: "To deny a plaintiff access to the courts for redress of such a wrong [no water service] would be a gross injustice." (*Ibid.*)

Similarly, in *Cundiff*, this court allowed a lawsuit to proceed against telephone companies that allegedly had been deceptively charging customers hidden phone rental charges. (*Cundiff v. GTE California Inc*, *supra*, 101 Cal.App.4th at pp. 1406-1407). The court affirmed the limits imposed by section 1759, holding that "[s]ection 1759 defines and limits the power of courts to pass judgment on, or interfere with, what the [PUC] does." (*Id.* at p. 1405.) However, the court found that the plaintiffs were not challenging the companies' rates, but only their billing practices, and thus "would not have the effect of reversing, correcting or annulling any decision or order of the commission . . . ." (*Id.* at p. 1411.)

We next turn to application of the *Covalt* test to Davis's claims.

2. *The Covalt test supports a finding of exclusive PUC jurisdiction over Davis's claims.*

Under our Supreme Court's decision in *Covalt*, we consider (1) whether the PUC has the authority to adopt a regulatory policy; (2) whether the PUC has exercised that authority; and (3) whether the superior court action would hinder or interfere with the PUC's exercise of regulatory authority. (*Covalt*, *supra*, 13 Cal.4th at pp. 924, 926, 935; accord, *Hartwell*, *supra*, 27 Cal.4th at p. 266.)

First, it is undisputed that the PUC has the authority to adopt tariffs governing applications to interconnect solar energy generating systems to a utility's electricity grid. Second, the PUC has exercised that authority by its approval of Rule 21, Rule 16, and the CREST and NEM programs. The central question here, therefore, is whether Davis's action "would hinder or interfere with the PUC's exercise of regulatory authority." (*Hartwell*, *supra*, 27 Cal.4th at p. 266.) We conclude that it would.

Preliminary, we note that the gravamen of Davis's action is that SCE has failed to comply with Rule 21, Rule 16 and its rules regarding the CREST and NEM programs, all of which have been approved by the PUC as part of its regulatory program. In addition, each of Davis's causes of action is currently alleged in the proceeding pending before the PUC. We will address each cause of action in turn.

With respect to Davis's first cause of action for deceit, the alleged misrepresentation pertains to the sizing of Davis's solar generating systems under the NEM program, which is precisely the issue raised in Davis's second complaint before the PUC. In order to prove a claim for deceit, Davis will need to show that SCE made a false statement of fact to Davis. As our Supreme Court has held: "'"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."' [Citation]" (*Small v. Fritz Companies, Inc*. (2003) 30 Cal.4th 167, 173; accord, *McClain v. Octagon Plaza, LLC* (2008) 159 Cal.App.4th 784, 792.) The tort "encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' . . . . [Citations.]" (*Small*, *supra*, at p. 174.)

In order to determine whether SCE made a false statement of fact to Davis regarding the sizing of his solar generating systems, the trial court would need to interpret the sizing requirements under the NEM and CSI programs, precisely the subject of the pending PUC proceeding. This determination could therefore interfere with the PUC's interpretation of the NEM and CSI tariffs.

27

We next turn to Davis's second through fourth causes of action for SCE's failure to comply with Rule 21's deadlines for processing his solar generating applications under the NEM program. As we discuss above, Rule 21 provides that the PUC has "initial jurisdiction" over interpretation and implementation of Rule 21 and provides a process for dispute resolution and the filing of a complaint with the PUC. The rule's specification that the PUC has "initial jurisdiction" is not determinative of whether the PUC has exclusive jurisdiction but is a factor for us to consider in evaluating Davis's claims.

Significant here is the complexity of the determination of whether SCE has violated the deadlines set forth in Rule 21. As a threshold matter, different deadlines apply depending on whether the proposed projects are "exporting" or "non-exporting" facilities under the rule. Further, analysis of SCE's compliance with the deadlines will require interpretation of Davis's obligations under the rule. While the determination of whether SCE provided notice to Davis whether his application was complete within 10 days, as alleged in the second cause of action, appears straightforward, the other deadlines are more complicated.[16]

For example, the 20-day deadline alleged in the third cause of action for completing the initial engineering review runs from the date the application is deemed complete, a date subject to interpretation. Similarly, the fourth cause of action alleges SCE's failure to comply with the 30-day deadline to complete the processing of NEM interconnection applications, but this provision provides that applications "normally" will be processed within 30 business days, specifies what needs to be completed before the 30-day clock begins to run, and includes many exceptions to the 30-day time period, all

---

[16] While arguably the claims alleged in the second cause of action could be determined by the superior court without interfering with the PUC's authority, we find that this deadline claim should be considered as part of the other causes of action for violation of deadlines under Rule 21 and therefore also falls within the exclusive jurisdiction of the PUC.

28

of which will need to be interpreted with respect to the 20 applications submitted by Davis.

The fifth and ninth causes of action allege SCE's failure to pay for specified upgrades under Rule 21 by improperly classifying Davis's solar generating facility as an "interconnection facility" instead of a "distribution facility." These causes of action will likewise require interpretation of Rule 21, a task particularly suited to the PUC.

In causes of action six through eight, the complaint alleges SCE's unlawful implementation of its CREST program. The sixth cause of action challenges how SCE calculated the costs for Davis's solar applications submitted under the CREST program, an issue requiring interpretation of Rule 21. Notably, Rule 21 provides only that a Distribution Provider "may agree" to reduced costs for atypical interconnection requests. It would be up to the PUC to determine whether there are circumstances under which SCE should have reduced Davis's application costs. (See Rule 21, § C.1.b(5) [E.3.a(iv)].) The seventh and eighth causes of action allege that SCE improperly allowed Coronus to "daisy chain" its projects to avoid the size limitations applicable to Rule 21 and the CREST program and, by allowing Coronus to take a position in the queue ahead of Davis, denied him entry into the CREST program.

Resolution of whether "daisy chaining" violates Rule 21 and whether Coronus should have been granted approval to participate in the CREST program is precisely what the PUC should determine, not the superior court. Indeed, as we discuss above, the PUC has already issued a decision that addresses "daisy-chaining" in another context. Determination of whether SCE improperly allowed the practice of "daisy-chaining" for Coronus's application as part of its implementation of the CREST program is the type of determination best suited to the PUC.

We conclude that each of Davis's causes of action will require interpretation of Rule 21, Rule 16, the CREST program or the NEM program, which determinations "would hinder or interfere with the PUC's exercise of regulatory authority" with respect to interconnection of solar generating systems to utility electricity grids. (*Hartwell*, *supra*, 27 Cal.4th at p. 266.) Indeed, the interpretation of Rule 21, Rule 16, and the

29

CREST and NEM programs is analogous to the analysis of SCE's tariffs for "small commercial customers" this court found to fall within the exclusive jurisdiction of the PUC in *Anchor Lighting v. Southern California Edison* Co., *supra*, 142 Cal.App.4th at p. 550, and the interpretation of the SCE rate schedule for mobile home parks the Fourth District found to be in the exclusive jurisdiction of the PUC in *Schell v. Southern Cal. Edison Co.*, *supra*, 204 Cal.App.3d at p. 1046.[17]

While we affirm the trial court's judgment sustaining SCE's demurrer without leave to amend, this will not leave Davis without a remedy. The PUC has extensive powers to award injunctive relief, reparations and penalties. Further, review of the PUC's ruling is available in the Court of Appeal under section 1759. If Davis receives a favorable ruling from the PUC but seeks relief beyond the equitable remedies available to the PUC, he will at that time have "ripe" claims to be filed in the superior court.[18] (See *Schell v. Southern Cal. Edison Co.*, *supra*, 204 Cal.App.3d at p. 1047.)[19]

---

[17] Because we affirm the trial court's order finding that the PUC had exclusive jurisdiction over Davis's claims, we do not reach the issue raised by SCE of whether the court should have applied the doctrine of exhaustion of administrative remedies or primary jurisdiction.

[18] As SCE has acknowledged in its brief, "if this Court affirms the Trial Court's ruling that the [PUC] has exclusive, initial jurisdiction to adjudicate Davis's claims, it does not necessarily foreclose a later action for damages in Superior Court."

[19] While the court in *Schell* does not discuss the concept of ripeness other than to find that the plaintiff's claims "will not be ripe until the PUC and the Supreme Court have made a final determination as to whether or not the DMS-II schedule applies to him" (*Schell v. Southern Cal. Edison Co.*, *supra*, 204 Cal.App.3d at p. 1047), other courts have addressed the issue of ripeness with respect to review of an agency's action. (See, e.g., *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171, 174 [challenge to Coastal Commission guidelines for conditions of permit approval not ripe where lawsuit did not challenge application of guidelines to specific permit approval]; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1216-1217, 1222 [challenge to PUC condition applicable to utilities not ripe because PUC had not yet applied its interpretation to a concrete set of facts].)

As our Supreme Court held in *Pacific Legal Foundation* with respect to the ripeness doctrine, "its basic rationale is to prevent the courts, through avoidance of

# DISPOSITION

The judgment is affirmed.  SCE shall recover its costs on appeal.


FEUER, J.*


We concur:



PERLUSS, P. J



ZELON, J.

---

premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  (*Pacific Legal Foundation v. California Coastal Com.*, *supra*, 33 Cal.3d at p. 171.)  In this case, as in *PG&E Corp.*, an action in superior court to challenge SCE's interpretation of Rule 21, Rule 16 and the CREST and NEM programs will only become ripe once the PUC has made a final determination, after any appellate review, as to its interpretation of those provisions as applied to Davis's solar applications.  (See *PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal.App.4th at p. 1217.)

\*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DAVID DAVIS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>    Defendant and Respondent. | B256737<br><br>(Los Angeles County<br>Super. Ct. No. EC061441)<br><br>ORDER CERTIFYING FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on April 7, 2015 was not certified for publication in the Official Reports. For good cause it now appears that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), and the requests pursuant to California Rules of Court, rule 8.1120(a) for publication are granted.

IT IS HEREBY ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____    _____    _____

PERLUSS, P. J.          ZELON, J.          FEUER, J.*

_____

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1