Filed 1/20/16  Richmond v. Superior Court CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DANIEL RICHMOND et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>Real Party in Interest. | B260243<br><br>(Los Angeles County Super. Ct. Nos. BC497689 & YC066729) |
| DANIEL RICHMOND et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>SOUTHERN CALIFORNIA EDISON COMPANY,<br><br>Defendant and Respondent. | B260268<br><br>(Los Angeles County Super. Ct. No. BC497689) |

| | |
|---|---|
| LORI BARBER et al., | B260268 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. YC066729) |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | |
| Defendant and Respondent. | |

ORIGINAL PROCEEDING in mandate.  Petition dismissed.

APPEAL from orders of the Superior Court of Los Angeles County.  John Shepard Wiley, Jr., Judge.  Reversed with directions.

Law Offices of Martin N. Buchanan and Martin N. Buchanan for Petitioners, Plaintiffs and Appellants.

Girardi & Keese, John Girardi; The Girardi Firm, Matthew D. Girardi; Peterson Law Group and John S. Peterson for Petitioners, Plaintiffs and Appellants Daniel Richmond et al.

Stolpman, Krissman, Elber & Silver, Thomas G. Stolpman, Donna Silver and Dennis M. Elber for Petitioners, Plaintiffs and Appellants Lori Barber et al.

No appearance for Respondent Superior Court.

Munger, Tolles & Olson, Stephen M. Kristovich, Jeremy A. Lawrence, Ronald K. Meyer; Patricia A. Cirucci; Brian A. Cardoza; Carla M. Blanc; Lim, Ruger & Kim, Christopher Kim, Sandra Sakamoto and Arnold Barba for Real Party in Interest, Defendant and Respondent Southern California Edison Company.

_____

2

Plaintiffs Daniel Richmond et al. filed a petition for writ of mandate and an appeal after the trial court sustained demurrers to their third amended complaints without leave to amend on the ground the Public Utilities Commission (PUC) had exclusive jurisdiction, or alternatively primary jurisdiction, over their tort and inverse condemnation claims against Southern California Edison (SCE). Plaintiffs contend the PUC does not have exclusive jurisdiction over any of their claims and the trial court abused its discretion in concluding, in the alternative, that the PUC had primary jurisdiction over plaintiffs' claims. We agree on both points and reverse the trial court's orders. We dismiss the writ petition as moot.

## BACKGROUND

Plaintiffs are 102 residents of a neighborhood adjacent to SCE's Topaz electrical substation in Redondo Beach. The trial court consolidated for all purposes the actions against SCE filed by Lori Barber and seven other plaintiffs and Daniel Richmond and 93 other plaintiffs alleging their properties had been invaded for decades by stray electrical currents escaping from the Topaz substation.

1. **Plaintiffs' third amended complaints**

The operative pleadings for each group of plaintiffs are the third amended complaints, which are almost identical. The complaints allege SCE designed and constructed the Topaz substation, and has owned, operated, inspected, tested, maintained, and controlled it since the 1960's. The complaints allege that since at least the early 1980's, their properties have been invaded by "entirely avoidable, stray, uncontrolled, manmade electric currents" escaping from the equipment at the Topaz substation. Plaintiffs allege these electric currents are uncontrolled with respect to both "the amount of current leaking and/or intentionally deposited into the earth/ground" and "where in the earth/ground the leaking electric currents will go." The complaints allege these stray electric currents are caused by SCE's unreasonable and unsafe design, operation, installation, inspection, testing, maintenance, repair, replacement, management, coupling, supervision, and control of its substation equipment, its electrical distribution system

3

equipment, and its electrical service supply equipment, which "was, and is, leaky, defective, and inadequate for its intended purpose."

Plaintiffs allege SCE has been aware for many years that stray electric currents are escaping from its Topaz substation and plaguing the nearby residents, but has failed to correct the problem, even though SCE could prevent these escaping currents through the exercise of reasonable care.

The complaints further allege SCE has deliberately allowed the currents to escape from its equipment, which "is supposed to, but has not, and does not, have the functional integrity to reasonably and safely contain said escaping electric currents, and/or to provide adequate and normal means to carry SCE's return electric currents back to their source so that they can complete their circuit. Instead . . . SCE has unlawfully allowed, and continues to allow, its electric currents to escape, to enter unsafely into residential properties and premises, including those of Plaintiffs, and to stray uncontrollably . . . across said properties and premises, using the earth/ground as it takes all paths . . . back to the source." Plaintiffs further allege the stray currents invading their properties result from SCE's use of "the earth/ground" as the "'normal return'" path for the stray currents to return to their source, the Topaz substation, in violation of PUC General Order 95, rule 33.2 (rule 33.2).

Plaintiffs allege they are constantly exposed to these stray currents, all day, every day, in every season, but moisture in the ground and atmosphere exacerbate the problem. The "sandy, salty, wet soil" in the area of their homes "conducts electric currents more efficiently." As a result of the stray electric currents, plaintiffs allege they have suffered repeated unpleasant, disturbing, and offensive electric shocks and unpleasant tingling sensations while inside and outside their residences; serious medical and health problems, including headaches, bleeding, gastrointestinal problems, debilitating fatigue, joint pain, abdominal inflammation, and elevated liver enzymes; and severe emotional distress and anxiety. They have also experienced their household appliances burning out, exploding, and catching fire. Circuit breakers frequently trip and light bulbs frequently burn out.

4

The currents have also damaged plumbing, electrical service panels, and the buildings themselves.  The complaints also allege that the stray currents are potentially lethal "in the event of an earthquake, a lightening [*sic*] strike, or power surge," and they created a further hazard by electrifying the gas line running down one neighborhood street,[1] all of which contribute to plaintiffs' "severe emotional stress, distress and anxiety."

The complaints also allege that the stray currents have so greatly diminished the marketability and value of plaintiffs' homes as to make them impossible to sell because plaintiffs would be required to disclose the stray currents.  Moreover, real estate brokers and agents do not want to become involved in selling the affected homes.  Plaintiffs allege SCE's stray electrical currents constitute a tangible physical invasion of plaintiffs' properties, causing, inter alia, electric shocks and property damage, and resulting in a taking of plaintiffs' property for a public use without payment of just compensation.

The complaints distinguish the stray electric currents invading their properties from electromagnetic fields (EMF's).  Stray electric currents cause a direct exposure to currents conducted through the soil and other physical objects on the property, including humans and animals.  In contrast, EMF's cause low-frequency, ambient exposures from proximity to power lines or other electrically charged objects.  EMF's can be a normal byproduct of electrification and emanate from appliances and mobile phones, not just power lines.  EMF's do not "electrically 'charge' people and physical objects in the same way" as SCE's stray direct electric currents and do not have the same effects upon human anatomy.  EMF's are "scientifically incapable of causing the perceptible, tangible, and unpleasant shock incidents and sensations" plaintiffs experience from the stray currents invading their properties.  The complaints further distinguish the stray currents from "'neutral-to-earth'" voltage.

The complaints nonetheless refer to EMF's, but allege that they do so "*solely* for the purpose of proving diminished property values" because the high EMF levels on their

---

[1] The complaints allege the gas company "attempt[ed] to effectively rectify" the problem with the gas line by replacing its metal pipes with plastic ones.

properties must be disclosed to potential purchasers. The complaints further allege that "real estate brokers and agents do not want to become involved" in attempts to sell their homes because of both the stray currents and "the high levels of EMFs." Nevertheless, plaintiffs allege in their fraud causes of action that SCE, which owned some of the plaintiffs' homes before 1994, not only concealed the stray current problem and misrepresented the danger from stray currents, but also misrepresented the "health and safety danger" of the high levels of EMF's that SCE "disclosed the presence of . . . to potential purchasers."

The complaints set forth causes of action for intentional infliction of emotional distress, negligence and negligence per se, nuisance, fraud and deceit, negligent misrepresentation, trespass, inverse condemnation, and assault and battery. The complaints seek monetary recovery only, either damages or, with respect to the inverse condemnation claim, compensation for both the present fair market value of their homes and the diminution in fair market value caused by SCE's conduct.

## 2.	SCE's demurrers

SCE demurred to the third amended complaints on the grounds the trial court lacked jurisdiction over every claim and every cause of action failed to state a cause of action. With respect to jurisdiction, SCE argued the PUC has exclusive or primary jurisdiction over plaintiffs' claims under Public Utilities Code section 1759.[2] With respect to failure to state a cause of action, SCE argued only that the inverse condemnation cause of action was inadequately pleaded and that plaintiffs were precluded by *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939 (*Covalt*), from basing their intentional infliction of emotional distress, fraud, and negligent misrepresentations claims on the presence of EMF's.

Plaintiffs filed a joint written opposition to the demurrers, and SCE filed a reply.

---

[2] Undesignated statutory references pertain to the Public Utilities Code.

### 3.   PUC's amicus brief

The trial court contacted the PUC and, in the presence of the parties' counsel, asked the PUC to file an amicus brief.  The PUC did so.  In its brief, the PUC asserted that it had exclusive jurisdiction over plaintiffs' claims.  It argued:  "If this Court were to award damages based on a violation of GO [General Order] 95, Rule 33.2, it would not be enforcing Commission standards and policies.  The Court would instead be rendering the underlying determination that the Rule had been violated.  That is a factual determination squarely within the Commission's authority, competence, and expertise to make.  Thus, any determination by the Court would interfere with and prevent the Commission from addressing the issue.  It would also second-guess what conclusion the Commission might reach based on the same facts.  It is also possible that a Court determination would unintentionally result in new or inconsistent requirements regarding the design, construction, operation, maintenance, and safety of utility equipment and facilities.  Section 1759 bars such a result."

Alternatively, the PUC argued it had primary jurisdiction over the claims and the trial court should defer to its "unique subject matter and technical expertise in matters concerning utility facilities and operations" and "whether GO 95 has been violated."

The PUC's brief also argued that, although it did not have exclusive jurisdiction over EMF's, the policy it had adopted regarding EMF's barred plaintiffs' claims.

The parties filed written responses to the PUC's brief.

### 4.   Trial court's ruling

At the hearing on SCE's demurrers, the trial court adopted its tentative ruling, which is not part of the appellate record, but apparently sustained the demurrers without leave to amend on the ground the PUC has exclusive jurisdiction over plaintiffs' claims. The court's actual ruling on the demurrers is not reflected in the reporter's transcript of the hearing, the minute order for the hearing, or the notice of ruling SCE served.

The trial court explained its reasons for concluding that plaintiffs' claims were within the exclusive jurisdiction of the PUC:  "I think the two things that are most

7

important here is that the source of the liability rule is a PUC rule . . . ." "[W]hat the plaintiffs are saying, the PUC created a rule and the defendants broke it." "The second point is the technical nature of that liability rule. This case is all about electrical circuits and the proper way to close an electrical circuit. Were this matter to go further in this court, I would immediately be thinking about appointing a court-appointed expert, an electrical engineer . . . [b]ecause judges learn nothing about electrical circuitry in law school . . . . And when judges are ignorant, courts are vulnerable. People who are ignorant can make foolish decisions that when examined by those knowledgeable in the field are sadly, merely laughable, laughably wrong. And it's not good to have courts making laughably incorrect decisions, so courts, in a technical area like this, would need some help." "So in sharp distinction to the court system, the PUC actually has on its staff electrical engineers. They have pros who are technical experts. So for those two reasons, the liability comes from the agency's own rule, and two, the agency has technical expertise and prowess unmatched by a trial court. I would rule . . . that there is both exclusive and primary jurisdiction in the PUC, and I propose to stay this matter, for the plaintiffs to proceed, I guess, in San Francisco before the PUC. I don't think dismissing is right if I'm ruling on primary jurisdiction grounds, and I am, in the alternative."

Counsel for SCE argued that the court had no jurisdiction to stay the action if it concluded the PUC had exclusive jurisdiction, and the court should instead dismiss it. The court declined to do so. It then noted plaintiffs had "immediate appellate recourse" and stated, "I certify the question" and "I am putting a stay on this case . . . immediately with that certification ruling."

The court then explained an additional rationale for its ruling: "Although [plaintiffs' counsel] says it's not a grid reliability case, respectfully, I think it would be possible for the PUC to take a different view. . . . [T]he PUC is in charge of ensuring . . . the overall reliability and rationality of the electrical grid . . . . There may be costs and benefits. There may be trade-offs that system engineers see and the PUC endorses that

8

are different tha[n] the individual jury decides upon with a more in-depth but less panoptic or synoptic view of the whole grid situation."

**5.      Proceedings in this court**

Plaintiffs were uncertain whether to challenge the rulings via a petition for writ of mandate or an appeal, so they filed both.  We consolidated the petition and appeal for all purposes.

<strong>DISCUSSION</strong>

**1.      Appealability**

The parties agree the trial court's stay was a nullity and its ruling is appealable. However, appellate jurisdiction cannot be conferred upon this court by the parties, and we must independently assess appealability.  (*City of Gardena v. Rikuo Corp.* (2011) 192 Cal.App.4th 595, 599, fn. 3, 605.)

The existence of either a final judgment or a statutorily appealable order is a jurisdictional prerequisite to maintaining an appeal.  (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 126.)  "It is the substance of a decree and not the form of a decree which determines whether it is final and appealable, or interlocutory and nonappealable. [Citation.]  '"As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory." [Citations.]'"  (*Furtado v. Schriefer* (1991) 228 Cal.App.3d 1608, 1613 (*Furtado*).)

Exclusive jurisdiction in a regulatory body is "jurisdictional in the sense that courts are utterly without the power to decide."  (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 937.)  Because the trial court's principal ruling was that the PUC has exclusive jurisdiction over plaintiffs' claims, it should have dismissed the case, as did the trial courts in *Davis v. Southern California Edison Co.* (2015) 236 Cal.App.4th 619, 622

9

(*Davis*), and *City of Anaheim v. Pacific Bell Telephone Co.* (2004) 119 Cal.App.4th 838, 842, when they concluded the PUC had exclusive jurisdiction over the case pending before them.

The trial court apparently stayed the action on the basis of its alternative ruling that the PUC has primary jurisdiction of plaintiffs' claims. The alternative ruling, however, was a nullity and could not be given any effect. The case could not be simultaneously or successively outside *and* within the scope of the trial court's jurisdiction. If the PUC had exclusive jurisdiction, the case would not spring back into the trial court's jurisdiction upon completion of whatever proceedings the PUC might conduct.

Moreover, primary jurisdiction is not a ground for demurrer. "'''"Primary jurisdiction' . . . comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is *suspended* pending *referral* of such issues to the administrative body for its views."''' (*Elder v. Pacific Bell Telephone Co.* (2012) 205 Cal.App.4th 841, 854–855 (*Elder*), italics added.) Such a referral is a discretionary decision by the trial court (*id.* at p. 855), not an actual *absence* of jurisdiction to act.

Accordingly, the trial court's ruling that the PUC had exclusive jurisdiction over the case divested the trial court of jurisdiction and left no issue for further consideration or action, not even compliance with the court's order. The court's order essentially terminated the action. The attempt to retain jurisdiction by means of a stay was a nullity, as was the court's attempt to "certify" a question for appeal.

This posture of this case is thus comparable to that in *Furtado*, *supra*, 228 Cal.App.3d 1608, where the trial court concluded an injured painter was the employee of the defendant, who had worker's compensation insurance, then stayed the litigation for the painter to pursue his remedies before the Workers' Compensation Appeals Board. (*Id.* at p. 1612.) The appellate court stated, "Had the trial court simply ruled Furtado was

10

an employee and terminated its jurisdiction, there would be no question as to the finality of its order, and no question that such an order would be appealable. The issue of appealability arises only because the trial court has purported to retain jurisdiction, apparently to preserve Furtado's action in the trial court should another court or the WCAB determine Furtado was not an employee." (*Id.* at p. 1613.) "[T]he trial court's order was final as there was nothing left for it to determine. . . . The trial court's stay of the proceedings and its attempt to retain jurisdiction were a nullity, and have no effect on the finality of the challenged order. As [the employer] argues, the order is appealable." (*Id.* at p. 1614.)

Accordingly, we conclude, based upon the substance of the trial court's finding and order, which left nothing for future determination and divested the trial court of jurisdiction, that the order is appealable.

## 2. Review of trial court's order sustaining a demurrer

"On appeal from a judgment after a demurrer is sustained without leave to amend, we assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded, and facts of which judicial notice can be taken. [Citation.] We construe the pleading in a reasonable manner and read the allegations in context. [Citation.] We determine de novo whether the pleading alleges facts sufficient to state a cause of action. [Citation.] We affirm the sustaining of the demurrer if the pleading or matters that are judicially noticeable disclose a complete defense. [Citations.] We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons. [Citation.]" (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1181.)

## 3. Exclusive jurisdiction

### a. General principles regarding exclusive PUC jurisdiction

The PUC is a state agency of constitutional origin that possesses broad authority to supervise and regulate every public utility in California and to "do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are

11

necessary and convenient in the exercise of such power and jurisdiction." (§ 701.) Its powers include setting rates, establishing rules, holding hearings, awarding reparation, and establishing its own procedures. (*Covalt*, *supra*, 13 Cal.4th at p. 915.) "'The commission's authority has been liberally construed' [citation], and includes not only administrative but also legislative and judicial powers." (*Ibid.*)

The Legislature has acted to limit judicial review of PUC actions. Section 1759, subdivision (a) provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

Section 1759, subdivision (a) "is not intended to, and does not, immunize or insulate a public utility from any and all civil actions brought in superior court," however. (*People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1144 (*Orloff*).) The Legislature "'provided for a private right of action against utilities for unlawful activities and conduct'" (*Mata v. Pacific Gas & Electric Co.* (2014) 224 Cal.App.4th 309, 315 (*Mata*)) by enacting section 2106: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person. [¶] No recovery as provided in this section shall in any manner affect a recovery by the State of the penalties provided in this part or the exercise by the commission of its power to punish for contempt."

12

"Section 2106 and section 1759 address different things. Section 1759 defines and limits the power of the courts to pass judgment on, or interfere with, what the commission does. Section 2106, on the other hand, confirms the full power of the courts to pass judgment on what utilities do." (*Cundiff v. GTE California, Inc.* (2002) 101 Cal.App.4th 1395, 1405 (*Cundiff*).) Given "the potential conflict between sections 1759 and 2106, the latter section must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." (*Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 (*Waters*).) "[T]he two sections must be construed in a manner which harmonizes their language and avoids unnecessary conflict. Section 2106 reasonably may be interpreted as authorizing only those actions which would not interfere with or obstruct the commission in carrying out its own policies." (*Waters*, at p. 11.)

"In *Covalt*, the Supreme Court '"established a three-part test to determine whether an action is barred by section 1759: (1) whether the commission had the authority to adopt a regulatory policy; (2) whether the commission had exercised that authority; and (3) whether the superior court action would hinder or interfere with the commission's exercise of regulatory authority."'" (*Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 236 (*Sarale*).) "Superior court jurisdiction is precluded only if all three prongs of the *Covalt* test are answered affirmatively." (*PegaStaff v. Pacific Gas & Electric Co.* (2015) 239 Cal.App.4th 1303, 1315 (*PegaStaff*).)

"[A]pplication of the third prong of *Covalt* does not turn solely or primarily on whether there is overlap between conduct regulated by the PUC and the conduct targeted by the suit. The fact that the PUC has the power and has exercised the power to regulate the subject at issue in the case establishes the first and second prongs of *Covalt*, but will not alone establish the third. Instead, the third prong requires a careful assessment of the scope of the PUC's regulatory authority and evaluation of whether the suit would thwart or advance enforcement of the PUC regulation. Also relevant to the analysis is the nature of the relief sought—prospective relief, such as an injunction, may sometimes interfere

13

with the PUC's regulatory authority in ways that damages claims based on past harms would not. Ultimately, if the nature of the relief sought or the parties against whom the suit is brought fall outside the PUC's constitutional and statutory powers, the claim will not be barred by section 1759." (*PegaStaff*, *supra*, 239 Cal.App.4th at p. 1318.)

"In short, an award of damages is barred by section 1759 if it would be contrary to a policy adopted by the PUC and would interfere with its regulation of public utilities." (*Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 275 (*Hartwell*).) "On the other hand, superior courts are not precluded from acting in aid of, rather than in derogation of, the PUC's jurisdiction." (*Ibid.*) "[T]rial courts have concurrent jurisdiction with the commission "'over controversies between utilities and others *not inimical to the purposes of the Public Utility Act*." [Citation.]'" (*Cundiff*, *supra*, 101 Cal.App.4th at p. 1406.)

The remedies available to the PUC to address violations of its standards include penalties, contempt, injunction, and mandamus. (*Hartwell*, *supra*, 27 Cal.4th at p. 277.) They are prospective in nature and are designed to curtail utilities' current and ongoing violations, not to redress injuries for past wrongs. (*Ibid.*) The PUC has no power to award damages to persons harmed by the conduct of a utility. (*Ibid.*; *Davis*, *supra*, 236 Cal.App.4th at p. 636.) It has authority to order reparations, but only "for rates that are 'unreasonable, excessive, or discriminatory.'" (*Davis*, at p. 636.)

An assertion by the PUC that it has exclusive jurisdiction over a particular case is neither binding nor entitled to deference; it is a legal issue to be decided by a court. (*Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123, 147, fn. 23 (*Wilson*); *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1194–1195.)

### b. Plaintiffs' claims do not fall within the PUC's exclusive jurisdiction.

The parties dispute whether the PUC has exclusive jurisdiction over any or all of plaintiffs' claims. Plaintiffs contend the PUC does not have exclusive jurisdiction because (1) their claims do not interfere with any supervisory or regulatory policy of the PUC and are, instead, in aid of the PUC's policies and standards because they allege,

14

inter alia, that SCE knowingly and intentionally violated rule 33.2 by using ground or earth as a normal return or circuit conductor; (2) plaintiffs seek a monetary recovery for past violations, whereas the PUC has no authority to award damages or redress injuries for past wrongs; and (3) the acts and omissions underlying plaintiffs' fraud and deceit, negligent misrepresentation, assault and battery, and inverse condemnation claims are outside the scope of PUC regulation.  Plaintiffs also cite the favorable appellate decision in a case brought by one of their neighbors, *Wilson*, *supra*, 234 Cal.App.4th 123.

SCE attacks the validity and reasoning of *Wilson*, *supra*, 234 Cal.App.4th 123, although it fails to mention that the California Supreme Court denied its petition for review and request for depublication more than two weeks before SCE filed its responsive brief in this case.  SCE further contends that (1) all of plaintiffs' claims require interpretation of rule 33.2, and the PUC has exclusive jurisdiction to interpret its own rules; and (2) "any determination by a superior court that SCE could be liable for damages as a result of stray current allegedly emitted from an 'unsafe' and 'unreasonable' electrical distribution system 'would interfere with the "broad and continuing supervisory or regulatory program" of the PUC' under which it regulates all aspects of public utilities' electrical distribution systems" because the PUC has exclusive jurisdiction to determine "whether the alleged emission of stray current from SCE's system was improper."  SCE addresses both of these argument to plaintiffs' tort claims, only.  SCE also argues that it is of no consequence to the jurisdictional issue that the plaintiffs are only seeking damages.

### (1)     First and second *Covalt* factors

The parties do not contest the applicability of the first two *Covalt* factors, i.e., whether the PUC has authority to adopt a regulatory policy applicable to the conduct upon which this action is based and whether it has exercised that authority.  Indeed, as plaintiffs point out in their reply brief, "all of their claims are premised on conduct by SCE that violates Rule 33.2," even though "only their negligence per se theory actually requires proof of such a violation as an essential legal element."

15

### (2)    The third *Covalt* factor

The key issue for decision in this case is whether allowing the litigation to proceed in the trial court would hinder or interfere with the PUC's exercise of regulatory authority.  A review of the published decisions regarding utilities' assertions of exclusive PUC jurisdiction reveals that this third *Covalt* factor is almost always the only one of the three factors in controversy, and the result in each case often depends upon whether the PUC had taken, or was in the process of taking, action with respect to the particular conduct or issue upon which the plaintiffs predicated their claims against the utility, such that a judgment in favor of the plaintiffs would "pass judgment on, or interfere with, what the commission does."  (*Cundiff*, *supra*, 101 Cal.App.4th at p. 1405.)  Whether the PUC has provided the utility with a "safe harbor," whether the claims implicate ratemaking, the remedies sought in the litigation, and whether the plaintiffs seek to redress past wrongs are also often of critical importance.  (*Covalt*, *supra*, 13 Cal.4th at pp. 948–949; *Hartwell*, *supra*, 27 Cal.4th at p. 276–278; *Pegastaff*, *supra*, 239 Cal.App.4th at p. 1318; *Orloff*, *supra*, 31 Cal.4th at p. 1155; *Elder*, *supra*, 205 Cal.App.4th at p. 853; *Waters*, *supra*, 12 Cal.3d at pp. 10–11 [claim for damages for failure to furnish adequate telephone service interfered with PUC's ratemaking authority in that PUC had approved utility's tariff, which limited utility's liability to customer to billing credit]; *Koponen v. Pacific Gas & Electric Co.* (2008) 165 Cal.App.4th 345, 358 (*Koponen*) [award of damages would not interfere with PUC's authority, but disgorgement of profits for utility's allegedly wrongful conduct would interfere with PUC's ratemaking jurisdiction]; *Schell v. Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039, 1046 [claim that recreational vehicle park should be billed at same rate as mobilehome parks "clearly within the exclusive purview of the PUC as part of its continuing jurisdiction over ratemaking and rate regulation in provision of baseline service to residential customers of the electric and gas corporations"].)

### (a) *Covalt*

*Covalt* involved an action to obtain both damages and injunctive relief for alleged harm caused by EMF's created by the defendant utility's power transmission lines running alongside the plaintiffs' home. The plaintiffs alleged that dangerously high EMF levels from the power lines constituted trespass and a nuisance, and established the basis for inverse condemnation. (*Covalt*, *supra*, 13 Cal.4th at pp. 910–912.) The trial court overruled the utility's demurrer on the ground the court lacked subject matter jurisdiction pursuant to section 1759. (*Id.* at p. 912.) The Supreme Court concluded the PUC had exclusive jurisdiction over the nuisance claim, in large part because the PUC had made findings that EMF's did not pose a substantial risk of harm and that utilities therefore need not take steps to reduce EMF's. (*Id.* at pp. 926–934.) In a later opinion, the Supreme Court summarized its application of the third factor in *Covalt*: "[A] civil action seeking a determination that electromagnetic fields arising from utility powerlines caused damage to the plaintiffs, or that the utility should be enjoined from locating its powerlines in particular areas, would be inconsistent with the findings of the PUC. Those findings included determinations that the available evidence did not support a reasonable belief or conclusion that electromagnetic fields from powerlines posed a substantial risk of harm, and that utilities need not take action to reduce field levels unless and until the evidence supported such a conclusion. Therefore, our decision concluded, the civil action would require an adjudication of issues previously considered by the PUC, and the resolution of those issues by the PUC was reflected in its official policies. For these reasons, we held that the action would interfere with and hinder the ongoing regulatory efforts undertaken by the PUC in connection with this subject matter, and section 1759 thus precluded the civil action." (*Orloff*, *supra*, 31 Cal.4th at p. 1146.)

Thus, in *Covalt*, the plaintiffs sought a ruling directly contrary to the PUC's decision that had created a safe harbor for utilities regarding the same conduct or condition that allegedly caused the harms for which the plaintiffs sought to recover. Here, as far as SCE has demonstrated, the PUC has not, by any decision, finding, or

17

ruling, established a safe harbor permitting electrical utilities to allow their substations to produce stray current that enters onto nearby private property.  Indeed, plaintiffs allege the stray current is caused by a *violation* of SCE's rules.  Accordingly, unlike the claims in *Covalt*, a verdict in favor of plaintiffs and an award of damages upon such verdict would not be inconsistent with any findings, decisions, or rulings of the PUC or interfere with its jurisdiction.

### (b)  *Hartwell*

Since *Covalt*, the California Supreme Court has addressed claims of exclusive PUC jurisdiction in several cases.  The most significant of these cases for resolving the jurisdictional issue presented here is *Hartwell*, *supra*, 27 Cal.4th 256.  There, more than 400 plaintiffs filed four suits against several industrial polluters for contaminating drinking water and numerous water utilities for supplying the plaintiffs with contaminated drinking water.  In addition to seeking damages for personal injuries, wrongful death, trespass, nuisance, and fraudulent concealment, the plaintiffs sought to enjoin the defendants from supplying contaminated water and engaging in unlawful business practices, disgorgement of profits, and other remedies.  (*Id.* at p. 261.)  In response to the lawsuits, the PUC instituted an investigation in which the plaintiffs from all four cases intervened.  (*Id.* at p. 262.)  While the investigation was pending, the trial courts stayed three of the actions pending outcome of the investigation and sustained the regulated utilities' demurrers without leave to amend in the fourth case.  (*Id.* at pp. 263–264.)

"After 31 months of investigation and study," the PUC issued its report, which "concluded that existing DHS [California Department of Health Services] drinking water quality standards adequately protect the public health and safety and that, over the past 25 years, the regulated utilities, including defendants in these lawsuits, had provided water that was '"in no way harmful or dangerous to health"' and had satisfactorily complied with DHS drinking water quality requirements.  [Citation.]  It also gave notice of its

18

intention to initiate a future investigation or rulemaking proceeding to investigate specific water quality issues." (*Hartwell*, *supra*, 27 Cal.4th at p. 263.)

Hartwell concluded that the first two *Covalt* factors were met (*Hartwell*, *supra*, 27 Cal.4th at pp. 272, 274), but some of the plaintiffs' claims for damages against the regulated utilities "would not interfere with any ongoing PUC regulatory program," while other claims would interfere. (*Id*. at p. 266.) The court noted the plaintiffs "alleged water contamination without regard to whether the water met drinking water standards . . . . They also alleged water contamination that exceeded and violated federal and state drinking water standards. In essence, plaintiffs challenged both the *adequacy of the standards* and compliance with those standards." (*Id.* at pp. 275–276, italics added.)

The court explained: "The first challenge, to the adequacy of the standards, is barred. An award of damages on the theory that the public utilities provided unhealthy water, even if that water actually met DHS and PUC standards, would interfere with a 'broad and continuing supervisory or regulatory program' of the PUC. [Citation.] In order to perform its regulatory functions, such as ratemaking, the PUC must have certain water quality benchmarks. . . . [T]he DHS standards serve as those benchmarks. A superior court determination of the inadequacy of a DHS water quality standard applied by the PUC would not only call DHS regulation into question, it would also undermine the propriety of a PUC ratemaking determination. Moreover, the DHS standards have been used by the PUC in its regulatory proceedings for many years as an integral part of its broad and continuing program or policy of regulating water utilities. As part of that regulatory program, the PUC has provided a safe harbor for public utilities if they comply with the DHS standards. An award of damages on the theory that the public utilities provided unhealthy water, even if the water met DHS standards, 'would plainly undermine the commission's policy by holding the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do.' [Citing *Covalt*, *supra*, 13 Cal.4th at p. 950.] Thus, such damage actions are barred." (*Hartwell*, *supra*, 27 Cal.4th at p. 276.)

19

Similarly, *Hartwell* concluded that granting injunctive relief would interfere with the PUC's exclusive jurisdiction because "the PUC found that the regulated utility defendants in this case were in compliance with DHS regulations and that 'no further inquiry or evidentiary hearings' were required regarding compliance. [Citation.] Based on that factual finding, the PUC impliedly determined it need not take any remedial action against those regulated utilities. A court injunction, predicated on a contrary finding of utility noncompliance, would clearly conflict with the PUC's decision and interfere with its regulatory functions in determining the need to establish prospective remedial programs." (*Hartwell*, *supra*, 27 Cal.4th at p. 278.)

In contrast, however, the plaintiffs' "damage claims based on the theory that the water failed to meet federal and state drinking water standards are not preempted by section 1759. A *jury award based on a finding that a public water utility violated DHS standards would not interfere with the PUC regulatory policy requiring water utility compliance with those standards.*" (*Hartwell*, *supra*, 27 Cal.4th at p. 276, italics added.) The court recognized that the PUC had concluded that the regulated water utility defendants "had substantially complied with DHS drinking water standards for the past 25 years," but noted that the PUC's "factual finding was not part of an identifiable 'broad and continuing supervisory or regulatory program of the commission' [citing *Covalt*, *supra*, 13 Cal.4th at p. 919], related to such routine PUC proceedings as ratemaking [citation] or approval of water quality treatment facilities. Nor was that finding part of a broad and continuing program to regulate public utility water quality, a point the PUC itself implicitly recognized during its investigation when it stated" that it was engaging in an information gathering process, not a rulemaking proceeding or enforcement proceeding. (*Hartwell*, at pp. 276–277.)

The court continued: "Although a PUC factual finding of past compliance or noncompliance may be part of a future remedial program, a lawsuit for damages based on past violations of water quality standards would not interfere with such a prospective regulatory program. As noted, the PUC can redress violations of the law or its orders by

20

suit (§ 2101), by mandamus or injunction (§§ 2102–2103), by actions to recover penalties (§§ 2104, 2107), and by contempt proceedings (§ 2113), but these remedies are essentially prospective in nature.  They are designed to stop the utilities from engaging in current and ongoing violations and do not redress injuries for past wrongs.  (See *Vila v. Tahoe Southside Water Utility* [(1965)] 233 Cal.App.2d [469,] 479 [the PUC has no authority to award damages].)  Here, plaintiffs alleged injuries caused by water that failed to meet state and federal drinking water standards 'for many years.'  *Because the PUC cannot provide for such relief for past violations, those damage actions would not interfere with the PUC in implementing its supervisory and regulatory policies to prevent future harm.*"  (*Hartwell*, *supra*, 27 Cal.4th at p. 277, italics added.)  "Although a jury award supported by a finding that a public water utility violated DHS and PUC standards would be contrary to a single PUC decision, it would not hinder or frustrate the PUC's declared supervisory and regulatory policies, for the reasons discussed earlier.  Under the provisions of section 1759, it would also not constitute a direct review, reversal, correction, or annulment of the decision itself.  Accordingly, such a jury verdict would not be barred by the statute."  (*Id.* at pp. 277–278.)

The claims of the plaintiffs in the present case are analogous to the *Hartwell* plaintiffs' claims for damages for personal injury resulting from the water utilities' failure to meet state and federal drinking water standards.  Plaintiffs allege SCE has violated the PUC's standards regarding the use of earth or ground as the path for currents to return to the Topaz substation, and they seek damages for the harm they allegedly have suffered as a result of SCE's violation.  As in *Hartwell*, permitting a jury award based on a finding that SCE violated the PUC's standards would be in aid of, rather than interfere with, the PUC regulatory policy requiring utility compliance with those standards.  Plaintiffs do not seek injunctive relief or challenge the adequacy of the PUC's standards.  Nor do they seek to impose liability upon SCE "'for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do.'"  (*Hartwell*, *supra*, 27 Cal.4th at p. 276.)  As in *Hartwell*, the PUC cannot provide plaintiffs with the

relief they seek, i.e., damages and just compensation for past violations. Moreover, the mere speculative possibility that the PUC may someday institute an investigation or enforcement action against SCE regarding the stray current problem in plaintiffs' neighborhood and thereafter conclude that SCE was in full compliance with all PUC requirements is insufficient to establish that judgments in favor of plaintiffs in the present case would interfere with, hinder, or frustrate the PUC's supervisory and regulatory authority. Accordingly, *Hartwell* supports plaintiffs' contention that the PUC lacks exclusive jurisdiction over their claims.

### (c) Other cases

In other cases seeking damages on the basis of a utility's violation of PUC requirements, courts have similarly found that litigation of the plaintiffs' claims would be in aid, not derogation, of the PUC's rules and was therefore not barred by section 1759. In *Mata*, *supra*, 224 Cal.App.4th 309, the heirs of a man electrocuted by a high voltage power line while trimming a redwood tree sued Pacific Gas & Electric Co. (PG&E) on a premises liability theory. (*Id.* at p. 312.) The plaintiffs alleged PG&E failed to inspect the power lines and trees and to maintain an adequate clearance between them. (*Ibid.*) The appellate court reversed the trial court's dismissal of the action as barred by section 1759, explaining: "PUC rules and prior orders repeatedly make clear that while a utility normally must maintain specified minimum clearances between its overhead electric lines and adjacent trees, the commission leaves to the determination of the utility whether greater clearances are necessary at particular locations to accomplish the purposes of rule 35, including to 'secure safety . . . to the public in general.' Nowhere in its rules or orders does the commission suggest that in making such determinations, the utility is relieved of its obligation to exercise reasonable care to avoid causing harm to others, or relieved of its responsibility for failing to do so. PG&E does have 'a duty to make the wires safe under all the exigencies created by the surrounding circumstances.' [Citation.] Failure to satisfy that duty subjects the utility to liability in judicial proceedings for damages to those harmed by its negligence." (*Id*. at p. 318.)

*Mata* distinguished *Sarale*, *supra*, 189 Cal.App.4th 225, in which property owners sought to prevent PG&E from trimming trees in excess of the minimum required by the PUC: "[T]he PUC has made unmistakably clear that in some cases safety or other considerations require more than minimum clearances and that the utility should use its judgment to go beyond the minimum when necessary to ensure the reliability of service or public safety. In the view of the [*Sarale*] majority, recognition of the landowners' claims would have effectively countermanded the authorization that the PUC granted the utility to make that determination and to extend clearance beyond the minimum when necessary to ensure service reliability or public safety. Here, on the other hand, plaintiffs' claims do not conflict with the PUC rule authorizing the utility to make a reasonable determination whether safety or other considerations require trimming beyond the minimum clearance. Permitting plaintiffs to prosecute in superior court their claim for having failed to use due care in making such a determination does not hinder or interfere with the exercise of the PUC's authority. To the contrary, awarding damages to those injured by the utility's failure to make such a reasonable determination as anticipated by the PUC complements and reinforces rule 35. A superior court action for such damages is 'in aid of, rather than in derogation of, the PUC's jurisdiction.'" (*Mata*, *supra*, 224 Cal.App.4th at pp. 319–320.)

Similarly, in *PegaStaff*, *supra*, 239 Cal.App.4th 1303, the appellate court concluded that section 1759 did not bar a suit against PG&E by a temporary staffing agency based on PG&E's adverse treatment of the plaintiff and preferential treatment of competing staffing agencies, purportedly in order to comply with a PUC order to increase minority staffing. (*Id.* at pp. 1311–1312, 1326–1331.) The court observed that, although PegaStaff's first amended complaint seemingly alleged that PG&E's preferential tier system was necessary to comply with a general order of the PUC, the order actually made it clear that utilities were not authorized to achieve the goals set forth in the order by establishing a preferential tier system. (*Id.* at pp. 1326–1328.) Accordingly, "Superior court action on a claim based on a preferential system will not hinder or obstruct the

PUC's exercise of regulatory authority. To the contrary, just as in *Hartwell* and *Mata,* this suit will enforce, not obstruct, the PUC regulation." (*Id.* at p. 1327.) The court further found that, like the claims in *Hartwell* and *Mata*, PegaStaff's action was a claim for "damages . . . based on past conduct that was not approved by the PUC, even though related to subject matter over which the PUC does exercise regulatory authority." (*Id.* at p. 1329.)

As in *Mata* and *Pegastaff*, plaintiffs here also seek damages based upon past conduct that they allege violated a PUC rule. The PUC's regulation of electrical utilities with respect to grounding and other aspects of electrical distribution does not establish the third factor under *Covalt*. (*PegaStaff*, *supra*, 239 Cal.App.4th at p. 1318.) Permitting the litigation to proceed would be in aid, not in derogation, of the PUC's jurisdiction.

In a somewhat similar vein, the court in *Cundiff*, *supra*, 101 Cal.App.4th 1395, concluded that section 1759 did not bar the plaintiffs' suit, which arguably furthered, not interfered with, the PUC's policies. (*Id.* at p. 1408.) There, the plaintiffs attempted to certify a class action on behalf of telephone customers the defendants had allegedly billed for decades to rent obsolete or nonexisting phone equipment, without the customers' knowledge. (*Id.* at p. 1400.) The court viewed the complaint as challenging only "the *manner* in which defendants billed them for rental of telephones, specifically, the alleged lack of information given to plaintiffs about the rental charge made each month by defendants. The gist of this suit is the alleged deception, intentional or negligent, resulting in plaintiffs' unknowingly paying rent month after month, year after year . . . ." (*Id.* at pp. 1406.) The court took judicial notice of a "'consumer advisory'" issued by the PUC to inform telephone customers that they might still be paying rent on old phone equipment they had replaced but failed to return to their telephone service provider, and advising them to check their phone bills for such charges. (*Id.* at pp. 1403–1404.) In light of that advisory, the court stated, "[P]laintiffs can reasonably argue that the suit actually furthers policies of the commission because it seeks to force defendants to bill

24

their customers in such a way that the customers are fully informed of the nature of defendants' charges." (*Id.* at p. 1408.)

The remedies sought were also a factor in *Cundiff*: "[D]efendants have not shown that the commission has authority to give plaintiffs the relief that plaintiffs can obtain under section 2106, that is, restitution or damages based on defendants' alleged violations of the aforecited provisions of the Business and Professions Code and the Civil Code, including exemplary damages for willful wrongful acts." (*Cundiff*, *supra*, 101 Cal.App.4th at pp. 1408–1409.)

Similarly, the court in *Elder*, *supra* 205 Cal.App.4th 841, concluded that section 1759 did not bar a class action seeking damages and declaratory and injunctive relief for "cramming," i.e., charging customers for optional services to which they had not agreed, by Pacific Bell. (*Id.* at pp. 845, 854.) Even though a PUC general order addressed cramming, it had "not approved 'a *general policy* of limiting the liability' of telephone companies and billing agents for cramming" nor established "'a safe harbor' against liability for entities that are found to engage in the illegal practice of cramming." (*Id.* at p. 853.) In addition, the PUC had no power to provide the plaintiffs with relief for past violations. (*Id.* at pp. 853–854.)

Here, as in *Cundiff* and *Elder*, plaintiffs seek damages and compensation for past violations that the PUC has no power to award, the PUC apparently has not established a "safe harbor" permitting electric utilities to emit stray current onto the property of others, and plaintiffs' attempt to hold SCE liable for violating rule 33.2 is in aid, not in derogation, of the PUC's jurisdiction.

The California Supreme Court's decision in *Orloff*, *supra*, 31 Cal.4th 1132, is also somewhat instructive, although it concerned an action instituted by the district attorneys of several counties to challenge Pacific Bell's marketing practices as false advertising and unfair business practices. The PUC was investigating some of the very same practices at the time the prosecutors filed suit. (*Id.* at p. 1137.) The district attorneys sought injunctive relief, civil penalties, and restitution. (*Id.* at p. 1141.) The trial and appellate

25

courts concluded that section 1759 barred the litigation because it might result in a ruling that would conflict with the parallel PUC proceedings. (*Id.* at pp. 1137–1138.) The Supreme Court disagreed: "[P]ast decisions of this court recognize that the PUC does not have exclusive jurisdiction over all actions against a public utility, and that *the mere possibility of, or potential for, conflict with the PUC is, in general, insufficient in itself to establish that a civil action against a public utility is precluded by section 1759*. . . . Nothing in the present action brought by public prosecutors inevitably would lead to conflicting rulings that would interfere with or undermine the regulatory authority of the PUC . . . ." (*Id.* at p. 1138, italics added.)

While *Orloff* was pending in the Supreme Court, the PUC issued its decision, which found Pacific Bell had violated the Public Utilities Code, but did not address Unfair Competition Law violations alleged by the district attorneys. The PUC fined the utility, but did not order restitution. (*Orloff*, *supra*, 31 Cal.4th at p. 1143.) Although the status of the plaintiffs as district attorneys was a crucial factor in the *Orloff* decision, the decision is nonetheless instructive because it chided the appellate court for "relying solely upon the circumstance that the allegations of the complaint in the present action were the same as the allegations in the PUC proceeding, rather than considering the extent to which *the remedies in the two proceedings were likely to be inconsistent* and thus were likely to undermine any ongoing authority or regulatory program of the PUC." (*Id.* at p. 1155, italics added.) The court also noted that the district attorneys' claims did not "involve ratemaking or any other matter assigned to the exclusive jurisdiction of the PUC." (*Ibid.*)

As in *Orloff*, the claims of plaintiffs here do not involve ratemaking and do not seek a remedy that would be inconsistent with any remedy the PUC might impose if it were to address the stray current issue upon which plaintiffs' claims are based. Mere potential for conflict with the PUC—which depends upon speculation that the PUC will instigate action against SCE based upon the stray current issue and that it will conclude

26

SCE is in full compliance with all applicable PUC standards—is insufficient to establish that section 1759 bars litigation of plaintiffs' actions.

With respect to plaintiffs' inverse condemnation claims, *Koponen*, *supra*, 165 Cal.App.4th 345, is also instructive. There, property owners sued PG&E, alleging it had made unauthorized use of the easements it held on plaintiffs' property by leasing or licensing rights in those easements to telecommunications and Internet companies for the purpose of installing and using fiber optic lines. (*Id.* at p. 348.) The PUC had granted PG&E's applications to enter into such leases and licenses (*id.* at p. 351), but the appellate court noted "there is no evidence the commission has considered the extent of PG&E's property interests in its rights-of-way, or that it has adopted any policy limiting a utility's liability for invading the property interests of private parties." (*Id.* at p. 354.) Moreover, "the commission has no authority to determine the property dispute between plaintiffs and PG&E." (*Id.* at p. 355.) "An award of damages for past invasions of plaintiffs' property rights would not interfere with the commission's authority to implement supervisory or regulatory policies to prevent future harm. And finally, a finding PG&E was violating plaintiffs' property rights would not interfere with the PUC's declared policy of encouraging joint use of PG&E facilities even if such finding would be contrary to or inconsistent with a PUC order, and would not constitute a review, reversal, correction, or annulment of the order itself." (*Id.* at p. 358.)

Plaintiffs in this case allege that the utility has "taken" their property through the invasion of stray currents from the substation. This is, in essence, a property dispute that the PUC has neither the authority to determine nor the power to remedy. In addition, SCE has not demonstrated that the PUC has established a "policy limiting a utility's liability for invading the property interests of private parties." (*Koponen*, *supra*, 165 Cal.App.4th at p. 354.)

SCE relies upon a different group of cases, including *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 666, which addressed the same actions as *Hartwell*, *supra*, 27 Cal.4th 256. It did not address any issue of jurisdiction, which was, of course,

27

resolved by the Supreme Court in *Hartwell*. Instead, in the portion of the opinion cited by SCE, the appellate court rejected the plaintiffs' claim that the trial court improperly defined the "'state and federal drinking water standards'" to which *Hartwell* referred as the "'numerical standards'" "adopted by the Department of Health Services (DHS)," and not "'non-numerical qualitative public health standards'" such as ""'pure, wholesome and potable."'" (*Groundwater Cases*, *supra*, 154 Cal.App.4th at pp. 673–674, 679-681.) Adopting the plaintiffs' definition would "run afoul of *Hartwell*" because it inevitably challenged the adequacy of the standards adopted by the DHS and PUC, which was specifically prohibited by *Hartwell*. (*Groundwater Cases*, at pp. 680–681.)

Here, unlike in the *Groundwater Cases*, plaintiffs' allegations neither expressly nor implicitly challenge the adequacy of the PUC's standards. They instead allege SCE violated at least one of those standards, rule 33.2, and, in doing so, harmed plaintiffs.

SCE also relies upon *Southern Cal. Gas Co. v. City of Vernon* (1995) 41 Cal.App.4th 209, in which the City of Vernon sought "to regulate the design and construction of a proposed gas pipeline" by denying the utility's applications for encroachment permits. (*Id.* at pp. 211–213.) The utility sought a writ of mandate. The appellate court concluded: "[U]nder the Constitution a city may not regulate matters over which the PUC has been granted regulatory power, the Legislature has granted regulatory power to the PUC over the safety of gas pipelines, and the PUC in fact has promulgated rules on this subject. Therefore, Vernon cannot purport to regulate the design or construction of the proposed pipeline under the guise of ensuring the pipeline's safety." (*Id.* at p. 217.) Trial court jurisdiction was not an issue. No one claimed to have been damaged by a utility's misconduct or negligence. The case is inapposite. Moreover, plaintiffs in this case do not seek to regulate the design of SCE's substation or prevent SCE from operating it, but merely to recover damages and compensation for harm caused by stray currents from that substation.

SCE also argues that the PUC has exclusive jurisdiction to interpret its rules. This premise assumes that rule 33.2 is ambiguous and requires interpretation. The PUC's

28

amicus brief never asserted that the rule was ambiguous or required interpretation. Although rule 33.2 is technical, it does not appear to be ambiguous: "Ground or earth shall not be used as a normal return or circuit conductor. In direct current supply systems or in single phase or polyphase supply systems, a neutral or any other conductor shall be used under normal use as a return or circuit conductor; however, the grounding of the neutral or any other conductor is not permitted as a normal return or circuit conductor. The neutral or any other conductor is permitted to be grounded only for the purposes of stabilization and protection." SCE argues that differing phrasings used by plaintiffs in their opposition to SCE's demurrers demonstrate the rule is ambiguous. These appear to be nothing more than paraphrasing or attempts to describe violations of the rule and in no way establish it is ambiguous. They are simply argument. Ultimately, SCE's brief reveals that by "interpretation," it chiefly refers to a finding or conclusion that SCE violated the rule: "[A]ny *interpretation* by a superior court *whether SCE violated Rule 33.2* would interfere with the PUC's jurisdiction to interpret and apply its own rules, regulations and order." (Italics added.) Absent any ambiguity in the rule, the determination of whether SCE violated it is a factual determination. No interpretation appears to be required.

Moreover, even if we were to conclude there is some ambiguity in the rule, SCE has not established that the PUC always has exclusive jurisdiction to interpret its own rules. The cases SCE cites do not establish this proposition. For example, in *Davis*, *supra*, 236 Cal.App.4th 619, the plaintiff alleged that SCE breached a PUC rule that provided, in pertinent part, "The Commission shall have initial jurisdiction to interpret . . . any provision of this Rule or of any agreements " for connecting solar panels to the electricity grid "and to resolve disputes regarding [a utility's] performance of its obligations" under PUC tariffs and rules. (*Id.* at p. 624.) SCE has not identified any comparable reservation by the PUC of either initial or exclusive jurisdiction to interpret General Order 95 or rule 33.2. Also, the plaintiff in *Davis* had already filed complaints against SCE with the PUC for the same acts and omissions that were the subject of the

litigation, and proceedings before the PUC were still pending at the time of the appellate decision. (*Id.* at pp. 634–635, 642.) The appellate court concluded each of Davis's claims required interpretation of PUC rules and would not be ripe until the PUC had rendered a ruling in his favor. (*Id.* at pp. 644–645.)

SCE also relies upon *City of Anaheim*, *supra*, 119 Cal.App.4th 838, in which Anaheim sought to force Pacific Bell to reimburse it for the cost of moving "overhead facilities" underground pursuant to a city ordinance. (*Id.* at pp. 841–842.) The appellate court noted, "The PUC '"has been held to have paramount jurisdiction in cases where it has exercised its authority, and its authority is pitted against that of a local government involving a matter of statewide concern,"'" such as "'""construction and maintenance of telephone lines within a city."'"" (*Id.* at p. 845.) The appellate court specifically rejected the proposition that the PUC had exclusive jurisdiction to decide every issue arising under the applicable PUC rule, but concluded there was "an 'existing policy or ongoing regulatory effort by the PUC that would be frustrated by the present action,'" namely, "the equitable determination of the order in which communities throughout the state should have their overhead facilities moved underground, a matter of statewide concern over which the PUC has jurisdiction." (*Id.* at p. 846.) Thus, the case does not support SCE's position that the PUC always has exclusive jurisdiction to interpret its own rules.

SCE also relies upon *Sarale*, *supra*, 189 Cal.App.4th 225, in which walnut growers sought damages and declaratory and injunctive relief for PG&E's conduct in trimming their walnut trees growing beneath power lines to a height precluding nut production. (*Id.* at pp. 232–234.) The relevant PUC rule mandated specific minimum clearances between vegetation and power lines, but did not establish maximum limits. (*Id.* at pp. 238–239.) The appellate court concluded section 1759 barred the litigation. It explained, "Allowing owners of land containing overhead power lines to seek individualized judicial determinations of what might be 'necessary' or 'proper' vegetation would cause a regulatory nightmare for the commission that section 1759 was intended to prevent." (*Id.* at p. 242.) "The commission's adoption of a minimum

30

trimming standard reflects its determination that, in every situation, trimming clearance must meet the minimum standard in order to sufficiently ensure the safety of the electric system, surrounding property, and the public. Such a standard necessarily recognizes that, in certain situations, safety considerations will demand that trimming exceed the minimum. The question of whether trimming must exceed the minimum standards on any particular section of an overhead powerline is a *factual issue* that is within the exclusive jurisdiction of the commission to decide." (*Id*. at pp. 242–243, italics added.) Thus, the court concluded the PUC had exclusive jurisdiction to prevent a "regulatory nightmare," not because there was a rule to interpret. Indeed, the issue for the PUC to determine was factual, not the meaning of its own rule.

Accordingly, we reject SCE's contentions that the PUC has exclusive jurisdiction to interpret its own rules and that interpretation of a rule is required in this case.

### (d)   *Wilson*

Jurisdiction in the trial court is also supported by a recent decision involving the same stray currents from the Topaz substation, in which SCE raised essentially the same argument for PUC exclusive jurisdiction as in the present case. (*Wilson*, *supra*, 234 Cal.App.4th 123.) *Wilson* was an appeal from a jury verdict awarding substantial damages to a woman who lived next to the Topaz substation on claims of intentional infliction of emotional distress, negligence, and nuisance, all based upon SCE's failure to properly supervise, secure, operate, maintain, or control its electrical substation, allowing stray electrical currents to enter Wilson's home, which SCE had owned until 1999. (*Id.* at pp. 129, 132.) After the verdict, SCE unsuccessfully argued that the PUC had exclusive jurisdiction over Wilson's claims. (*Id.* at p. 140.) SCE appealed and contended that Wilson's claims fell within the PUC's "exclusive jurisdiction over the design, siting, operation, and safety of Edison's electrical distribution system." (*Id.* at p. 141.) Division Four of this court rejected this contention after concluding the case did not satisfy the

31

third *Covalt* factor.[3]  The *Wilson* court stated, "[W]e also disagree with Edison's (and the PUC's) assertion that the commission's adoption of various policies governing the design, construction, maintenance, operation, and safety of electrical distribution facilities is sufficient to establish the PUC's exclusive jurisdiction over the claims in this case."  (*Id.* at p. 148.)

The court continued:  "As Wilson correctly points out, it is not sufficient that the PUC issued general regulations requiring that electrical distribution systems be operated and maintained in a manner to ensure safety and service, and setting forth certain design requirements.  Indeed, the Supreme Court in *Covalt* cited with approval *Pierce v. Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68 [212 Cal.Rptr. 283], in which the appellate court held that section 1759 did not bar the plaintiff's action for damages caused by a defective transformer that exploded and sent 7,000 volts of electricity into house wiring designed to carry 120 volts.  The Supreme Court noted the appellate court properly rejected 'a contention that the superior court lacked jurisdiction under the *Waters* rule simply because a general regulation (Gen. Order No. 95) provides that electric supply systems shall be maintained in such a condition as to give "safe" service and utilities shall "exercise due care to reduce to a minimum" the hazards from overhead wires.'  (*Covalt*, *supra*, 13 Cal.4th at p. 945.)"  (*Wilson*, *supra*, 234 Cal.App.4th at p. 149.)

SCE also cited particular PUC rules within General Order 95 that address "grounding requirements for common neutral systems like the Topaz system," not including rule 33.2, and argued it could not meet Wilson's demand to eliminate stray voltage on her property while still complying with the PUC's regulations.  (*Wilson*, *supra*, 234 Cal.App.4th at p 149.)  The *Wilson* court rejected SCE's argument that this demonstrated satisfaction of the third *Covalt* factor:  "First, although there is no doubt that the general orders require grounding of substations, it may be that Edison could

---

[3] Notably, at SCE's request, the *Wilson* court took judicial notice of the amicus brief the PUC filed in the trial court in this case.  (*Wilson*, *supra*, 234 Cal.App.4th at p. 147, fn. 22.)

32

comply with the regulations and still mitigate the stray voltage that results from grounding. Although that is an issue that is more appropriately submitted to the PUC under the primary jurisdiction doctrine [citation], it does not mean that Wilson's claims are barred under the *Covalt* test." (*Id.* at pp 149–150.)

The court continued: "Second, when the PUC adopted G.O. 174, entitled 'Rules for Electric Utility Substations,' the commission explained why it was needed: 'The Commission's current General Orders 95, 128, and 165 are already designed to promote safe operation of electric utility and communications infrastructure facilities, and provide minimum safety requirements which the utilities are to supplement with additional safety precautions when local conditions warrant. However, *these General Orders do not give guidance as to how utilities operate and maintain their substations, and there are no specific regulations governing substation operation.*' (*Order Instituting Rulemaking to Implement Com. Regulations Relating to the Safety of Electric Utility Substations* (Oct. 25, 2012) Cal. P.U.C. Dec. No. 12-10-0292 [2012 Cal. PUC LEXIS 470, p. *2], italics added.) G.O. 174 does not, however, contain any such regulations. Instead, the general order requires each electric utility to establish and update an inspection program for its substations, maintain records of its inspections, and submit annual inspection program summaries and reports summarizing completed inspections to the Utilities Safety and Reliability Branch of the PUC. (G.O. 174, rules 30, 31, 32, 33, 40.) And although the PUC ordered the utilities to meet annually to share their newly developed practices and review their own practices in light of other utilities' practices, with the expectation that 'a "best practice" will evolve that shows how to most effectively operate and safely control the electric systems in California . . . even as these practices continue to reflect the unique elements of each system' (Cal. P.U.C. Dec. No. 12-10-029, *supra*, 2012 Cal. PUC LEXIS 470, at p. *10), it is unclear whether this 'best practice' will address stray voltage issues. Therefore, we cannot say with any certainty that litigation of Wilson's claims would hinder or interfere with the PUC's regulatory policy.

"Finally, the purported exercise of authority that Edison relies upon is of a vastly different character than the kinds of exercise of authority found in cases in which courts applied the *Waters* rule and found that section 1759 bars the plaintiff's action. In most of those cases, the PUC conducted (or was in the process of conducting) investigations into or adopted regulations on the specific issue alleged in the plaintiffs' lawsuit. (See, e.g., *Covalt*, *supra*, 13 Cal.4th 893 [plaintiffs alleged damages due to defendant's powerlines emitting EMF radiation on plaintiffs' property; PUC conducted research projects on and investigations into the potential health effects of EMF]; *Sarale v. Pacific Gas & Electric Co.*[, *supra*,] 189 Cal.App.4th 225 [117 Cal.Rptr.3d 24] [plaintiffs sought damages and injunctive relief based on a utility's alleged excessive trimming of commercially productive walnut trees located under the utility's power lines; the commission had adopted a regulation mandating minimum distances that must be maintained between conductors and vegetation, expressly declined to mandate the maximum limits of tree trimming, and left to the determination of the utility whether greater clearances were necessary under the circumstances to accomplish the purposes of the regulation]; *Brian T. v. Pacific Bell* (1989) 210 Cal.App.3d 894 [258 Cal.Rptr. 707] [plaintiffs sought damages and injunction to compel utility to restrict access of sexually explicit materials to adults through certain methods; commission had conducted investigation and hearings on how to restrict access and adopted a different method]; *Schell v. Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039 [251 Cal.Rptr. 667] [owner of an RV park filed action alleging his RV park was entitled to residential baseline gas and electricity allocations; proceedings were pending before the commission on whether RV parks should come under a special rate schedule for provision of baseline service].)

"In light of the absence of any indication that the PUC has investigated or regulated the issue of stray voltage, and without any evidence that stray voltage cannot be mitigated without violating the PUC's regulation requiring grounding, we cannot say that Wilson's lawsuit would interfere with or hinder any supervisory or regulatory policy of

34

the PUC. Therefore, we hold that Wilson's claims are not within the exclusive authority of the PUC under section 1759." (*Wilson*, *supra*, 234 Cal.App.4th at pp. 150–151.)

SCE argues *Wilson* was wrongly decided. We disagree. Although *Wilson* is somewhat distinguishable from this case, not only based upon its posture, but also upon the claims asserted, it is nonetheless supportive of our conclusion that allowing plaintiffs to litigate this case in the trial court would not hinder or interfere with the PUC's exercise of regulatory authority.

### (e) Conclusion

We sympathize with the trial court's concerns about the technical complexity of the present case, but neither its complexity nor the PUC's technical expertise divest the trial court of jurisdiction. Triers of fact are often called upon to resolve highly technical disputes and conflicting testimony by opposing experts. It will fall upon the parties to educate the trier of fact on the technical aspects of this case when it is time to adjudicate the issues. The trial court erred by sustaining SCE's demurrer to the plaintiffs' third amended complaints on the ground of exclusive PUC jurisdiction.

### 4. Primary jurisdiction

The parties also dispute whether the trial court abused its jurisdiction by sustaining the demurrers on the alternative ground that the PUC had primary jurisdiction over the case. We conclude the trial court erred.

### a. The primary jurisdiction doctrine

"The doctrine of primary jurisdiction of regulatory agencies . . . is concerned with situations where an issue should be addressed by an administrative agency for its initial determination because there is a need for (1) uniformity of application of administrative regulations and uniformity of answers to administrative questions, and (2) the expert and specialized knowledge of the relevant agency, i.e., the expertise that a regulatory agency can bring to a conflict." (*Cundiff*, *supra*, 101 Cal.App.4th at p. 1412.) "'[T]he primary jurisdiction doctrine advances two related policies: it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps

35

assure uniform application of regulatory laws. [Citations.]' [Citation.] There is no rigid formula for when the doctrine is applied. 'Instead, resolution generally hinges on a court's determination of the extent to which the policies . . . are implicated in a given case [Citations.]." [Citation.] Courts will also consider whether applying the doctrine presents an inadequate remedy to litigants, such as whether there would be an unreasonable expense and delay." (*Ibid.*) The determination is a discretionary one for the trial court. (*Id.* at p. 1413.)

**b.      A demurrer cannot be sustained on the basis of primary jurisdiction.**

Primary jurisdiction is not a lack of actual jurisdiction, but a discretionary deferral to administrative process. While a demurrer may be based upon the theory that "[t]he court has no jurisdiction of the subject of the cause of action alleged in the pleading" (Code Civ. Proc. § 430.10 subd. (a)), the doctrine of primary jurisdiction is not a proper basis for a demurrer, and a trial court errs by sustaining a demurrer on that ground. (*AICCO, Inc. v. Insurance Co. of North America* (2001) 90 Cal.App.4th 579, 594.)

As far as the record reveals, the only motions pending before the trial court on the day it ruled that the PUC had exclusive or, in the alternative, primary, jurisdiction were SCE's demurrers and motions to strike. Thus, the trial court's alternative ruling, based on primary jurisdiction, appears to have been a rationale for sustaining the demurrer. This was error.

**c.      The trial court abused its discretion by deferring to the PUC under the primary jurisdiction doctrine.**

The court's remarks during the hearing on SCE's demurrers reveal that the court's principal ground for deferring to the PUC under a primary jurisdiction theory was the technical complexity of the ultimate question for the trier of fact—whether SCE was violating rule 33.2—and the PUC's employment of "experts" in the field. However, any finding by the PUC on this point, whether in favor of plaintiffs or of SCE, would not resolve plaintiffs' claims because the PUC has no power to award plaintiffs damages and, while such a finding might have evidentiary use, it would not necessarily preclude the

36

trier of fact from reaching a different conclusion. (*Hartwell*, *supra*, 27 Cal.4th at pp. 276–277.) Thus, the ultimate effect of deferring to the PUC would merely be to increase the parties' expenses and unreasonably delay resolution of the case, all to obtain what may amount to nothing more than an advisory opinion, as far as plaintiffs' claims are concerned.

Moreover, there has been no showing, and there is no reason to conclude, that the PUC has either expertise or the power to adjudicate fraud, negligent misrepresentation, intentional infliction of emotional distress, negligence, assault, battery, nuisance, trespass, and inverse condemnation claims. Nor has there been a showing that plaintiffs' claims implicate "the uniformity of application of administrative regulations and uniformity of answers to administrative questions." After all, plaintiffs allege SCE violated the PUC's rule, they do not argue, for example, that SCE was required to do something different or more extensive than rule 33.2 requires.

Accordingly, we conclude that, even apart from the error of sustaining a demurrer on the basis of primary jurisdiction, the trial court abused its discretion by concluding the action should be stayed under the doctrine of primary jurisdiction.

5.      **Sufficiency of pleading of inverse condemnation cause of action**

Although the trial court did not address the sufficiency of the pleading of any particular cause of action in its ruling on SCE's demurrers, SCE argues on appeal that the inverse condemnation claim fails to state a cause of action. Because the pertinent rules of review require affirmance of the judgment if it is correct on any ground stated in the demurrer, we must address this contention.

a.      **Inverse condemnation**

"Property is 'taken or damaged' within the meaning of article I, section 19 of the California Constitution, so as to give rise to a claim for inverse condemnation, when: (1) the property has been physically invaded in a tangible manner; (2) no physical *invasion* has occurred, but the property has been physically *damaged*; or (3) an intangible intrusion onto the property has occurred which has caused no damage to the property but

37

places a *burden* on the property that is direct, substantial, and peculiar to the property itself." (*Oliver v. AT & T Wireless Services* (1999) 76 Cal.App.4th 521, 530, citing *Covalt*, *supra*, 13 Cal.4th at p. 940.)

####        b.        The complaints sufficiently allege inverse condemnation claims.

Plaintiffs' third amended complaints allege a physical invasion of their properties by the stray currents and physical manifestations of such invasions, including electrical shocks and destruction of, or damage to, appliances, electrical panels, plumbing, and the building themselves. Although the currents are not visible, they are nonetheless quite tangible in that they can be felt by the sense of touch. SCE argues the stray currents are analogous to noise, odor, light, or the EMF's at issue in *Covalt*, *supra*, 13 Cal.4th at page 940. The Supreme Court in *Covalt* characterized the EMF's as "wholly intangible phenomena that, like television and radio waves, 'occupy' no 'space' at all and cannot even be perceived by the senses." (*Ibid.*) The court therefore concluded the EMF's did not constitute a physical intrusion upon the Covalts' property, but "an intangible intrusion that does not physically damage the property." (*Id.* at pp. 941–942.) Plaintiffs here do not base their claims upon EMF's, but stray currents that physically invade their property, currents they feel through shocks, and currents that cause physical damage to their property. These currents are also distinguishable from noise, odor, or light, which are not perceptible to the touch and do not cause physical damage.

SCE argues that the Richmond plaintiffs' complaint fails to sufficiently allege property damage because it does not identify which of plaintiffs' 23 properties have been damaged. We disagree. The complaints allege the properties of *all plaintiffs* have been damaged by the invading stray currents. For pleading purposes, this is sufficient. SCE will no doubt propound discovery to determine each plaintiff's particular damage claims.

## DISPOSITION

The orders sustaining SCE's demurrers to the third amended complaints are reversed and the cause is remanded to the trial court with directions to vacate its orders sustaining the demurrers and enter new orders overruling the demurrers. The writ petition is dismissed as moot. Plaintiffs/petitioners are awarded their costs on appeal and with respect to their writ petition.

NOT TO BE PUBLISHED.

LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.